PEOPLE v HACKETT

Docket No. 111717. Argued March 11, 1999 (Calendar No. 17). Decided
June 29, 1999. Rehearing denied 461 Mich 1205.

William P. Hackett was convicted by a jury in the Macomb Circuit
Court, George C. Steeh, J., of delivery of 50 grams or more but less
than 225 grams of cocaine. The Court of Appeals, HOEKSTRA, P.J.,
and WAHLS and GRIBBS, JJ., reversed in an unpublished opinion per
curiam, concluding that, although the admission of testimony
regarding the defendant's silence when confronted by an accom-
plice was not constitutional error, it was error under *People v
Bigge*, 288 Mich 417 (1939), that would result in manifest injustice
(Docket No. 195698). The people appeal.

In an opinion by Chief Justice WEAVER, joined by Justices TAYLOR,
CORRIGAN, and YOUNG, the Supreme Court *held*:

There was no constitutional error in the use of the defendant's
silence; reference to that silence did not implicate the rule of
*Bigge*, because the silence did not occur in the face of an accusa-
tion. Rather, the prosecutor's reference to the defendant's failure to
confront an accomplice is conduct evidence, admissible to impeach
the defendant's testimony that he was an innocent bystander on the
evening in question.

1. Application of *Bigge* is limited to tacit admissions in the form
of a defendant's failure to deny an accusation. Such admissions
may not be used as substantive evidence of a defendant's guilt. A
criminal defendant's failure to respond to an accusation is not pro-
bative evidence of the truth of the accusation. Thus, *Bigge* is inap-
plicable to the resolution of this case. The silence referenced by
the prosecutor did not occur in the face of an accusation, and the
evidence was relevant and admissible.

2. The silence referenced during the prosecutor's closing argu-
ment was neither constitutionally protected nor in violation of the
rule of *Bigge*. If any error arose, it would be harmless under any
standard. The prosecution presented ample direct evidence against
the defendant, the references to defendant's silence were minimal,
and the defense used the same silence in a rehabilitative manner.

Reversed.

Justice KELLY, joined by Justices BRICKLEY and CAVANAGH, dissenting, stated that the trial court's admission of testimony regarding the defendant's silence was improper. The prosecution improperly made reference to the defendant's silence during lock up in violation of his Fifth and Fourteenth Amendment rights to silence. In addition, the prosecutor's use of the defendant's silence violated the rule of *People v Bigge*. Finally, the trial court should have excluded the evidence under MRE 403, because it was highly prejudicial and utterly lacking in probative value.

The defendant was cross-examined and impeached for his failure to confront his accuser, and for his failure to profess his innocence to his accuser. It is logical to assume that the defendant's postarrest, post-*Miranda* silence was due to a desire not to talk to the government. It is not unknown for police agencies to place informants in jail cells in the hope that an accused may make incriminating statements. Moreover, it is not unheard of for police agencies to place secret electronic listening devices or other monitoring equipment in cells, in part to detect violence. The lack of a visible state agent does not preclude a finding of a constitutional violation.

*Bigge* held that a defendant's silence in the face of an accusation cannot be used as evidence of guilt. In this case, the prosecutor twice improperly told the jury that the defendant was silent in the face of an accusation. This was error requiring reversal under *Bigge*. The prosecutor told the jury that a coconspirator was an accuser and argued that the defendant would have confronted him had he been an innocent man. Under these facts, it was error requiring reversal to argue, on cross-examination and in closing, that the defendant's failure to confront his accuser during a postarrest, post-*Miranda* situation evidences his guilt.

Under MRE 403, evidence is properly excluded if its probative value is substantially outweighed by the danger of unfair prejudice. It is also excluded if it would result in confusion of the issues or a misleading of the jury. The evidence of the defendant's silence was highly prejudicial and not probative. The prosecutor's remarks should have been stricken as being too ambiguous to be useful and highly prejudicial to the defendant.

Because the reference to the defendant's silence during his post-arraignment lock up in 1999 violates the federal constitution, the proper standard of review is governed by federal law. The standard to be applied for unpreserved and preserved nonstructural constitutional error is the same: harmless beyond a reasonable doubt. The state bears the burden of proof. In the particular setting of his case, the prosecution has failed to meet its burden. The evidence

against the defendant was anything but overwhelming; much of it was circumstantial. In short, nothing presented by the prosecution indicates that the constitutional error was harmless or insignificant beyond a reasonable doubt.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *Carl J. Marlinga,* Prosecuting Attorney, *Robert J. Berlin,* Chief Appellate Attorney, and *Laura Z. Sullivan,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Peter Jon Van Hoek*) for defendant-appellee.

WEAVER, C.J. The evidentiary question posed by this case is whether the trial court's admission of testimony regarding defendant's silence was proper.[1] Defendant was convicted of delivery of 50 grams or more but less than 225 grams of cocaine.[2] The Court of Appeals reversed defendant's conviction, concluding that, although the admission of the testimony was not constitutional error, it was error under *People v Bigge,* 288 Mich 417; 285 NW 5 (1939). The Court of Appeals further concluded that failure to address what it found to be error under *Bigge* would result in manifest injustice. The Court of Appeals reversed defendant's conviction and remanded for a new trial.

For the reasons that follow, we agree with the Court of Appeals that there was no constitutional error in the use of defendant's silence. We further hold that the reference to defendant's silence did not implicate the rule of *Bigge,* because the silence did not occur in the face of an accusation. Rather, the

---

[1] Defense counsel did not object to the admission of testimony regarding defendant's silence.

[2] MCL 333.7401(2)(a)(iii); MSA 14.15(7401)(2)(a)(iii).

prosecutor's reference to defendant's failure to confront Logue is conduct evidence, admissible to impeach defendant's testimony that he was an innocent bystander on the evening in question.

We reverse the decision of the Court of Appeals and reinstate defendant's conviction.

I

FACTS

In the early morning hours of August 13, 1991, undercover State Police Detective Richard Gilbert purchased cocaine from Patrick Logue. Logue later testified that defendant, William P. Hackett, was his supplier. Defendant was nearby when the August 13 sale occurred. Defendant claims that he was framed.

Defendant and Logue were high school friends who renewed their friendship in 1991. In July 1991, Logue house-sat for defendant. Items were apparently missing from the defendant's home afterwards, and, when confronted by defendant, Logue admitted taking certain items. Logue returned the items taken, except, contends defendant, a Godiva chocolate box that ultimately reappeared on August 13, 1991, containing the cocaine sold to Detective Gilbert.

Logue also met Detective Gilbert in 1991. Detective Gilbert was participating in an undercover investigation of Logue's employer, Erotic Image, a company that provided strippers for parties. Logue worked for Erotic Image as a stripper, an escort for female strippers, and as a sales representative. Logue took the job at Erotic Image to be near women and drugs. He smoked marijuana on a daily basis.

Logue testified that defendant supplied cocaine for each of the sales Logue transacted with Detective Gilbert, although the cocaine Logue first sold to Detective Gilbert was actually intended for Logue's boss. Following the first sale, Logue made several drug sales to Detective Gilbert, through and including the sale on August 13. For that sale, Logue had initially agreed to exchange four ounces of cocaine and $1,500 for five pounds of marijuana in a parking lot. Logue testified that defendant modified the deal at the last minute to be an exchange of five ounces of cocaine for five pounds of marijuana and that defendant suggested changing the location of the transaction to a hotel room.

Logue testified that late in the evening on August 12, he went to defendant's house, where defendant asked for his keys. The prosecutor theorized that defendant placed the cocaine in Logue's trunk at that time. Logue then went to Kevin Hall's home where he again met with defendant. Logue then drove to a Knight's Inn in Sterling Heights where he was to meet Detective Gilbert. Following close behind Logue was defendant, riding in a car driven by Mark Boyle. A police officer testified that the car in which defendant was riding mimicked the lane changes of Logue's car and that defendant appeared to be checking behind Boyle's car periodically. The officer testified that he followed Boyle's car at distances varying from thirty to one-hundred yards. When Logue pulled into the motel, Boyle picked up coffee at a nearby drive through and parked at a restaurant near the motel. Police testified that defendant waited outside the car, looked under the hood with Boyle, and appeared nervous. He walked toward the

motel a couple times, before stopping and remaining at Boyle's car. Defendant testified that Boyle's car was having trouble and he was helping Boyle look under the hood.

At the motel, Logue took a bag from the trunk and placed it in a garbage can. He met with Detective Gilbert, tested the marijuana, and then retrieved the cocaine. The cocaine was in a plastic cellophane bag, inside the Godiva chocolate box, and inside a brown bag. Logue's fingerprint was later discovered on the brown bag and defendant's fingerprint on the foil interior of the Godiva box. Logue, Boyle, and defendant were arrested. A search of Boyle's car produced a gun.

Logue, defendant, and Boyle were arraigned on August 14, 1991. The three posted bond on August 15, 1991, and were released. At the preliminary examination in October 1991, defendant claimed that the case against him should be dismissed because of the lack of a basis for his arrest. On May 29, 1992, the district judge agreed, dismissing all charges against defendant and Boyle. Logue, however, was bound over on one count of delivering 50 to 225 grams of cocaine. The circuit court affirmed the district court's dismissal of charges against defendant, and the Court of Appeals denied the prosecutor's application for leave to appeal.

In May 1993, Logue pleaded guilty to the August 13, 1991, drug sale, in exchange for dismissal of other cases. In September 1993, he pleaded guilty to a July 1991 drug sale to Detective Gilbert. After pleading guilty and before his sentencing, Logue agreed to testify against defendant. Consequently, another complaint was filed against defendant and a

warrant issued for his arrest. Defendant, with his attorney, surrendered to the police on November 8, 1993. On August 12, 1994, defendant was bound over on two counts of delivery. The defendant was ultimately tried on one count of delivering 50 to 225 grams of cocaine and one count of delivering less than 50 grams of cocaine.

The April 1995 trial of defendant lasted five days. During the prosecutor's cross-examination of defendant, the following exchange occurred:

*Q.* So, sir, there came a point in time when you must have found out you were you being implicated in this, is that right?

*A.* Yes, sir.

*Q.* And I'll bet you were just stark raving mad to find out you, the innocent man, had nothing to do with this, was being implicated in this; is that right?

*A.* I was quite concerned and upset, yes.

*Q.* Well, I would hope so. You're an innocent man, been accused of a very serious offense?

*A.* That's correct.

*Q.* And the first opportunity you got to tell Patrick to set the record straight, you did that, didn't you?

*A.* I don't understand the question.

*Q.* The first chance that you got to tell Mr. Logue to clear up any notion of your involvement in this case you did that, didn't you?

*A.* I haven't had any contact with Patrick Logue since we were locked up after the arraignment.

*Q.* And, Sir, the first words out of your mouth to Mr. Logue were, tell them I didn't have anything to do with this; isn't that right?

*A.* I don't recall ever saying that to Mr. Logue.

*Q.* That's because you never said it; isn't that true?

*A.* That's probably true. I don't even recall anything like that.

Defense counsel did not object to this testimony. Nor did defense counsel object when, during closing arguments, the prosecutor harkened back to this testimony as follows:

> [There] wouldn't be bars strong enough to keep persons falsely accused from trying to just get at the person that made that accusation. Tell him, tell the police, you tell those police I had nothing to do with this, and you know why it didn't happen? You know why it didn't happen? Because at the time they were arrested it could not have been foreseen Mr. Logue would be giving testimony against Mr. Hackett. And another reason it didn't happen is because it is not true. Mr. Logue is not falsely accusing Mr. Hackett. He's truthfully accusing Mr. Hackett. Mr Hackett is involved. Mr. Hackett involved [sic] the cocaine and Mr. Hackett is guilty, and that's why Mr. Hackett did not act like a person falsely accused because he was not.

The jury acquitted defendant of the lesser charge related to a July sale of cocaine by Logue to Detective Gilbert, but convicted defendant of delivering between 50 and 225 grams of cocaine in the early morning hours of August 13, 1991. Defendant was sentenced below the presumptive mandatory ten- to twenty-year sentence for a term of four to twelve years. Defendant's motion for a new trial was ultimately denied. On defendant's appeal of right, the Court of Appeals reversed. We granted the prosecutor leave to appeal and denied defendant's cross-application. 459 Mich 895 (1998).

II

We address whether the prosecutor's use of defendant's silence was error. As a preliminary matter, the parties have never agreed on when the silence refer-

enced by the prosecutor occurred. Indeed, up to and
through oral argument before this Court, this question
remained hotly contested. The timing of the refer-
enced silence is critical to determining whether the
prosecutor's references to defendant's silence consti-
tuted error.

A

The prosecutor first referred to defendant's silence
during cross-examination of defendant. As the
prosecutor's cross-examination progressed, it focused
specifically on the period after the 1991 arrest and
after defendant's 1991 arraignment, when Logue and
defendant were incarcerated together. This is clear
from the following excerpt of the cross-examination:

> *Q.* And the *first opportunity* you got to tell Patrick to set
> the record straight, you did that didn't you?
>
> *A.* I don't understand the question.
>
> *Q.* The *first chance that you got* to tell Mr. Logue to clear
> up any notion of your involvement in this case you did that,
> didn't you?
>
> *A.* I haven't had any contact with Patrick Logue *since we
> were locked up after the arraignment.*
>
> *Q.* And, Sir, the first words out of your mouth to Mr.
> Logue were, tell them I didn't have *anything to do with
> this; isn't that right?* [Emphasis added.]

While the prosecutor may not have initiated this line
of questioning in reference to the time defendant and
Logue were incarcerated together, he continued to
pursue that moment in time after the defendant
stated that he had not seen Logue since then. Indeed,
appellate defense counsel acknowledged twice during
oral argument that the prosecutor's cross-examination

of defendant referenced the time in 1991 when Logue and defendant were incarcerated together.

The prosecutor's second reference to defendant's silence appears similarly directed to the time during defendant's incarceration with Logue. The prosecutor argued in closing that there

> wouldn't be bars strong enough to keep persons falsely accused from trying to just get at the person that made that accusation. Tell him, tell the police, you tell those police I had nothing to do with this . . . . You know why it didn't happen? Because at the time they were arrested it could not have been foreseen Mr. Logue would be giving testimony against Mr. Hackett.

We acknowledge that the timing of the referenced silence in the prosecutor's closing is somewhat ambiguous. The statement seems to presume that defendant knew that Logue was his accuser in 1991 when they were arrested together, although it is clear from the record that defendant could not have foreseen that Logue would testify against him at that time. Despite this initial ambiguity, we find that the prosecutor's closing, like the cross-examination, ultimately focuses on the time "when they were arrested." The only time that defendant could have confronted Logue was when he and Logue were arrested and incarcerated together in 1991.

B

Defendant continues to argue that the prosecutor's reference to his silence implicates constitutional

issues.[3] His constitutional claims assume that the silence at issue occurred in 1993, rather than 1991. First, defendant argues that speaking to Logue would have violated a condition of his bond and, therefore, that use of his silence violated due process. However, in 1991, defendant's bond did not include the condition that he not contact Logue. Second, defendant argues that Logue was an agent of the police, and, therefore, that comment on his silence in Logue's presence violated both due process and his Fifth Amendment privilege against compelled self-incrimination. While it may be arguable that Logue was an agent of the police in 1993, there is no indication that Logue was an agent of the police in 1991 when he was incarcerated with defendant. Because the predicates of defendant's constitutional claims were not fulfilled during the relevant period, we need not address these claims here.

## III

After concluding correctly that the defendant's constitutional rights were not violated by the prosecutor's reference to defendant's silence, the Court of Appeals held that the prosecutor violated the rule of *People v Bigge, supra. Bigge* concerns adoptive or tacit admissions and

> precludes admissibility of a defendant's failure to say anything in the face of an accusation as an adoptive or tacit admission under MRE 801(d)(2)(B) unless the defendant

---

[3] As noted above, the Court of Appeals rejected defendant's constitutional claims, and this Court denied leave on his cross-application. However, defendant is nonetheless free to raise these claims here as an "alternative ground for affirmance." See *Middlebrooks v Wayne Co*, 446 Mich 151, 166, n 41; 521 NW2d 774 (1994).

"manifested his adoption or belief in its truth . . . . " [*People v McReavy*, 436 Mich 197, 213; 462 NW2d 1 (1990).][4]

Applying the rule of *Bigge,* the Court of Appeals reasoned:

> In this case, the evidence at trial did not indicate that defendant either adopted or believed the accusation. Therefore, the evidence should not have been admitted, and the prosecution should not have been permitted to base its argument on that evidence. [Unpublished opinion per curiam, issued February 24, 1998 (Docket No. 195698).]

We disagree with the Court of Appeals application of the *Bigge* rule in this case.

We take this opportunity to clarify the role of *People v Bigge* in ascertaining the admissibility of evidence regarding a defendant's silence. Although *Bigge* preceded the enactment of the Michigan Rules of Evidence, the rule of *Bigge,* like MRE 801(d)(2)(B), concerns tacit admissions. "The *Bigge* rule denies admissibility [of tacit admissions] because the inference of relevancy rests solely on the defendant's failure to deny." *McReavy* at 213. *Bigge* precludes the admission of a defendant's silence in the face of accusation as substantive evidence of his guilt. This Court has clarified that a defendant's prearrest silence is admissible for impeachment purposes. *People v Cetlinski (After*

---

[4] *McReavy* went on to quote Wigmore:

"Silence, when the assertion of another person would naturally call for a dissent if it were untrue, may be equivalent to an assent to the assertion. This, however, fixes the party, by adoption, with the other person's assertion, and thus it ceases to be a question of conduct evidence, and involves a genuine admission in express words. [2 Wigmore, Evidence (Chadbourn rev), § 292, pp 229-230.]" [*Id.*]

*Remand)*, 435 Mich 742, 757; 460 NW2d 534 (1990). *Cetlinski* held:

> [N]onverbal conduct by a defendant, a failure to come forward, is relevant and probative for impeachment purposes when the court determines that it would have been "natural" for the person to have come forward with the exculpatory information under the circumstances. [*Id.* at 760.]

The issue of prearrest silence is one of relevance. *Id.* at 757.

*Bigge* involved a prosecution for embezzlement. The silence referenced by the prosecutor in *Bigge* occurred when the defendant in *Bigge* failed to respond during a business conference to his brother-in-law's comment, "What's the use of going over this matter again. Charles [defendant Bigge] is guilty as hell." *Id.* at 419.

*Bigge* held:

> The time has not yet come when an accused must cock his ear to hear every damaging allegation against him and, if not denied by him, have the statement and his silence accepted as evidence of guilt. There can be no such thing as confession of guilt by silence in or out of court. The unanswered allegation by another of the guilt of a defendant is no confession of guilt on the part of a defendant. [*Id.* at 420.]

The Court in *Bigge* concluded that the admission of the brother-in-law's statement and the defendant's silence in response to it as evidence of defendant Bigge's guilt was error.[5] *Bigge*'s application is limited to tacit admissions, in the form of a defendant's failure to deny an accusation. Tacit admissions under the

---

[5] *Bigge* went on to conclude that the error was of constitutional proportion. The *Bigge* Court reasoned:

*Bigge* rule may not be used as substantive evidence of a defendant's guilt. A criminal defendant's failure to respond to an accusation is not probative evidence of the truth of the accusation.[6]

We conclude that *Bigge* is inapplicable to the resolution of this case. The silence referenced by the prosecutor did not occur in the face of an accusation. There is simply no statement that defendant's silence can be construed as tacitly adopting. Thus, the rule of *Bigge* is not violated by the admission of the evidence.

Further, we agree with the prosecutor's argument that defendant's failure to confront Logue while they were incarcerated together in 1991 is conduct evidence that impeaches defendant's testimony that he was merely following Logue to a party and was an

---

[E]rrors which deprive an accused of the right of due process of law cannot be composed thereby to the detriment of an accused. [*Id.* at 421.]

*Bigge* did not specify the precise type of due process error at issue, and we need not speculate regarding its concern. In this case, defendant's constitutional claims were properly resolved by the Court of Appeals as addressed above.

[6] As an aside, we note that after *McReavy* was decided, MRE 801(d)(2)(B) was amended. After 1991, MRE 801(d)(2)(B) is no longer subject to the rule announced in *People v Bobo*, 390 Mich 355; 212 NW2d 190 (1973). *Bobo* had applied *Bigge* broadly, stating that "If silence in the face of specific accusation may not be used, it would be a strange doctrine indeed that would permit silence absent such an accusation to be used as evidence of guilt." *Bobo* at 361. *Bobo* had held that a criminal defendant's silence could never be used against him, whether in the face of accusation or not. *People v Collier*, 426 Mich 23, 39; 393 NW2d 346 (1986), limited *Bobo*, holding that *Bobo* remained viable only to the extent that it precluded "impeachment for and comment on silence at the time of arrest in the face of accusation."

innocent bystander to the drug transaction. It would have been natural for defendant, under such circumstances, to confront Logue regarding the reason for his arrest when they were incarcerated together in 1991. Therefore, we hold that the evidence was relevant and admissible.

IV

Finally, while there is some merit to defendant's suggestion that the prosecutor's closing argument strayed from use of defendant's silence as impeachment to substantive evidence of his guilt,[7] the silence referenced, as discussed above, was neither constitutionally protected nor in violation of the rule of *Bigge.*

If any error arose from the prosecutor's closing reference, we would find it harmless under any standard. The prosecutor convincingly demonstrated ample direct evidence to convince the jury of defendant's guilt. The direct evidence includes: Logue's testimony, defendant's fingerprint on the interior of the Godiva chocolate box, his incriminating conduct as observed by surveillance police, and his proximity to the drug transaction on August 13, 1991.

---

[7] The prosecutor argued in closing that "Mr. Hackett involved [sic] the cocaine and Mr. Hackett is guilty, and that's why Mr. Hackett did not act like a person falsely accused because he was not." One reading of this statement, even within the context of the entire closing argument, see below, is that it suggested, intentionally or not, that defendant was involved in the drug deal because he did not confront Logue.

The silence referenced was also of limited probative value, as demonstrated by the defense's strategic decision during re-direct examination and closing, to demonstrate that it would not have been normal and natural for defendant to confront Logue. On re-direct examination of defendant, the defense attorney queried, "After you ended up getting arrested on the evening of August 12, 13, 1991, did you want to say anything or hear anything at all from Patrick Logue period?" The defendant responded, "Not particularly. I was, you know, looking at, I'm starting law school in a week and this guy has practically destroyed my life." During closing argument, the defense again sought to explain defendant's failure to confront Logue, again in a parallel format to that offered by the prosecution. The defense argued:

[The prosecutor] said gee, if [defendant] was falsely accused there wouldn't be bars strong enough at getting at Pat Logue, saying tell them I didn't do it. Well, he is missing the point completely in that respect. Frankly, you put yourself in [defendant's] shoes; you're on your way to a party; you're about to start law school, worked hard presently, been planning, got everything in order, and all of [a] sudden you find yourself arrested because it turns out Pat Logue was involved in a drug deal. What is to talk to him about? He's the last thing in the world you want anything to do with, period. Not only that, if you're a person with respect for law and order, you end up in this horrible situation, you having to defend yourself, you don't go and do something— you don't go and have contact with him individually, you have respect for the process of law; you have respect for trust for the judgment of juries. This is all frightening, and I'm scared, and it's very weird, but I'm going to trust and

I'm going to respect the process of law. [Defendant's]
response was exactly the response you want from some-
body who had lived their life right and has respect for the
law . . . .

Because the prosecution presented ample direct
evidence against the defendant, the references to
defendant's silence were minimal, and because the
defense used the same silence in a rehabilitative way,
we conclude that any error was harmless under any
standard.

V

We denied by order entered November 3, 1998,
defendant's cross-application for leave to appeal, and,
therefore, our review has been limited to the admis-
sion of testimony regarding defendant's silence. We
reverse the decision of the Court of Appeals and rein-
state the defendant's conviction.

TAYLOR, CORRIGAN, and YOUNG, JJ., concurred with
WEAVER, C.J.

KELLY, J. (*dissenting*). I would hold that the trial
court's admission of testimony regarding defendant's
silence was improper.

I disagree with the majority for three reasons. First,
I would find that the prosecution improperly made
reference to defendant's silence during lock up in vio-
lation of defendant's Fifth and Fourteenth Amend-
ment right to silence under the federal constitution.
US Const, Ams V, XIV. Moreover, I also agree with

the Court of Appeals that, under the facts of this case, the prosecutor's use of defendant's silence violated the rule of *People v Bigge*, 288 Mich 417; 285 NW 5 (1939). Finally, the trial court should have excluded this evidence under Michigan Rule of Evidence 403, as this evidence was highly prejudicial and utterly lacking in probative value. Because the trial court's error was not harmless, I would affirm the decision of the Court of Appeals.

I

As the majority correctly notes, the parties have never agreed on when the silence referenced by the prosecutor was to have occurred. The majority implicitly admits that a reference to defendant's silence during the 1993 period of incarceration would have violated defendant's constitutional right to remain silent. However, even if the prosecution's argument can fairly be said to refer to defendant's 1991 incarceration, the prosecutor's comment on his silence still violated defendant's constitutional right to remain silent.

Logue was not a state agent during the 1991 period of incarceration. Because of that, the majority maintains that the prosecution was free to use defendant's silence while in the presence of Logue as impeachment evidence against him. I disagree.

The use for impeachment purposes of a defendant's silence at the time of arrest and after receiving *Miranda*[1] warnings violates the Due Process Clause of the Fourteenth Amendment. *Doyle v Ohio*, 426 US

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

610; 96 S Ct 2240; 49 L Ed 2d 91 (1976); *Fletcher v Weir*, 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982); *Wainwright v Greenfield*, 474 US 284; 106 S Ct 634; 88 L Ed 2d 623 (1986). In *Doyle*, for example, the United States Supreme Court laid down the following rule: a prosecutor may not impeach a defendant's inculpatory story, told first at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings. Use of a defendant's silence in this manner violates due process because "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle, supra* at 617.

The facts of the instant case are similar to those in *Doyle* and its companion case, *Ohio v Wood*. The defendants in both *Doyle* and in this case were in custody, but were not being interrogated at the time the prosecutor argues that they should have professed their innocence. In *Doyle* the questioning was as follows:

> "*Q*. [By the prosecutor.] . . . You are innocent?
> "*A*. [By Doyle.] I am innocent. Yes Sir.
> "*Q*. That's why you told the police department and Kenneth Beamer when they arrived . . .
> "(Continuing.) . . . about your innocence?
>
>               *          *          *
>
> "*A*. . . . I didn't tell them about my innocence. No.
> "*Q*. You said nothing at all about how you had been set up?
>
>               *          *          *
>
> "*Q*. Did Mr. Wood?
> "*A*. Not that I recall, Sir.

\*    \*    \*

"*Q*. As a matter of fact, if I recall your testimony correctly, you said instead of protesting your innocence, as you do today, you said in response to a question of Mr. Beamer,—'I don't know what you are talking about.'

"*A*. I believe what I said,—'What's this all about?' If I remember, that's the only thing I said.

\*    \*    \*

"*A*. I was questioning, you know, what it was about. That's what I didn't know. I knew that I was trying to buy, which was wrong, but I didn't know what was going on. I didn't know that Bill Bonnell was trying to frame me, or what-have-you.

\*    \*    \*

"*Q*. All right,—But you didn't protest your innocence at that time?" [*Doyle, supra*, 426 US 614, n 5.]

*Doyle* was consolidated with *Ohio v Wood* where the defendant was also impeached, not for his failure to answer questions implicating *Miranda*, but for his failure to profess his innocence:

"*Q*. [By the prosecutor.] Mr. Beamer did arrive on the scene?

"*A*. [By Wood.] Yes, he did.

"*Q*. And I assume you told him all about what happened to you?

\*    \*    \*

"*A*. No.

\*    \*    \*

"*Q*. Mr. Wood, if that is all you had to do with this and you are innocent, when Mr. Beamer arrived on the scene why didn't you tell him?" [*Doyle, supra*, 426 US 613-614.]

Similarly, defendant in the instant case was cross-examined and impeached for his failure to confront his accuser, and for his failure to profess his innocence to his accuser.

The Court's broad pronouncement in *Doyle* was somewhat limited by *Fletcher v Weir, supra*. However, under *Fletcher*, post-*Miranda* silence continued to be inadmissable to impeach a defendant's credibility. *Id.*, 455 US 607.

Further support for this proposition is found in *Wainwright v Greenfield, supra*. In that case, the defendant argued a defense of insanity. His postarrest, post-*Miranda* warnings silence was then used by the prosecutor as evidence of sanity. The Supreme Court held that this violated due process. The source of the violation was the implicit assurance contained in the *Miranda* warnings "that silence will carry no penalty." *Id.*, 474 US 290 (citation omitted). The Court went on to state:

> The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. [*Id.*, 474 US 292.]

In this case, it would be as fundamentally unfair to punish defendant for electing to remain silent under the circumstances.

In each of these, the defendant's "silence" was in the physical presence of police officers or other recognizable state agents. The majority maintains that that condition is a prerequisite to finding a constitutional violation. I disagree. The United States Supreme Court has articulated no such explicit

requirement. Moreover, such a requirement ignores the simple realities of today's custodial environment. The lack of a visible state agent does not preclude a finding of a constitutional violation.

A recent federal case illustrates this point. In *Franklin v Duncan*,[2] the accused was charged with murder. The charge was based primarily on his daughter's alleged repressed memory of the killing. At trial, the prosecution presented testimony from the daughter that she had visited her father in jail after his arrest and had attempted to convince him to confess. She testified that he had not responded to her accusations, but instead pointed to a sign in the jail visiting room that indicated all conversations might be monitored. The trial court denied a defense objection to the testimony, and the prosecutor argued that this silence amounted to a tacit confession of guilt "worth its weight in gold." *Id.* at 1445.

On habeas corpus review, the district court found the admission of the accused's silence to have violated the defendant's Fifth Amendment rights, citing *Doyle, supra,* and stating:

> Petitioner chose to remain silent, knowing that he was in custody and that the government was listening to his calls. In declining to answer his daughter's question, Franklin explicitly pointed to the sign saying that the government monitored conversations. His pointing to the sign indicates that the desire not to talk to the government was his motivating factor in remaining silent. If this is not an invocation of the right to remain silent, it is difficult for the Court to imagine what would be. Surely petitioner need not state, "I am not answering your question, Eileen, because I am invoking my fifth amendment right against self-incrim-

---

[2] 884 F Supp 1435 (ND Cal, 1995).

ination" in order not to have his silence used against him.
[*Id.* at 1447.]

This result was affirmed by the Ninth Circuit Court of Appeals. *Franklin v Duncan*, 70 F3d 75, 78 (CA 9, 1995).

Similarly, in the instant case, it is quite logical to assume that defendant's postarrest, post-*Miranda* silence was due to a desire not to talk to the government.[3] It is not unknown for police agencies to place informants in jail cells in the hope that an accused may make incriminating statements. Moreover, it is not unheard of for police agencies to place secret electronic listening devices or other monitoring equipment in cells, in part to detect violence.

In today's custodial environment, it is logical that a defendant, advised of his right to remain silent and the consequences of speaking, will remain silent, even when no officers are visible. Using this silence against a defendant is just as "fundamentally unfair" as it was in *Doyle* and *Wainwright, supra.*

Thus, I would hold that the prosecution's references to defendant's silence during lock up were in violation of his Fifth and Fourteenth Amendment rights to silence under the federal constitution.

---

[3] At arraignment, the trial court is required, under the Michigan Rules of Criminal Procedure, MCR 6.104(E)(2), to inform a defendant, not represented by counsel, of his right to remain silent. Thus, it is presumed that defendant Hackett had received his *Miranda* warnings by the time he was in lock up after arraignment in 1991. The absence on the record of a valid waiver by defendant of his right to silence leads me to conclude that his right was violated by reference to it.

II

The majority also analyzes this case under the rule of *People v Bigge*, and holds that *Bigge* is not implicated in the instant case.[4] I disagree. In *Bigge*, we held that a defendant's silence in the face of an accusation cannot be used against him as evidence of guilt. "There can be no such thing as confession of guilt by silence in or out of court. . . . Defendant, if he heard the statement, was not morally or legally called upon to make denial or suffer his failure to do so to stand as evidence of his guilt." *Id.* at 420. The Court in *Bigge* found that this was a due process violation. The majority rejects the application of this case, stating that, since there was no face-to-face accusation at the time of the silence, there is no reason to rely on *Bigge*. I disagree.

According to the opinion, defendant did not know Logue would be his accuser during their 1991 incarceration. This is arguably correct. However, the pros-

---

[4] The majority attempts to use *People v Cetlinski (After Remand)*, 435 Mich 742, 757; 460 NW2d 534 (1990), in support of its proposition. Because *Cetlinski* deals with prearrest silence, I do not find it to be persuasive in the context of the instant case. Moreover, I would also find that *Cetlinski* and its predecessor, *People v Collier*, 426 Mich 23; 393 NW2d 346 (1986), upon which *Cetlinski* relies, are distinguishable from this case. *Cetlinski* involved a defendant who had made statements to the police and left out certain details. For example, the defendant omitted the fact that he had previously had a conversation with a waitress discussing burning down a building. Also, the prosecutor in *Cetlinski* did not ask the jury to infer guilt from the defendant's silence. 435 Mich 763. *Collier* also involves a defendant who "left out" certain pertinent facts when giving his statement to police. *Id.* at 26.

The instant case is distinguishable from *Collier* and *Cetlinski*. In those cases, the defendants made statements to the police about certain events, but omitted facts that would naturally have been included by a person with nothing to hide. In this case, the prosecutor is trying to impeach defendant's statements with the fact that defendant did not seek out Logue to confront him with the accusations against defendant.

ecutor improperly told the jury twice that defendant was silent in the face of an accusation (*ante*, pp 210-211). I would hold this to be error requiring reversal under *Bigge, supra*. As the majority has indicated, not even the parties can agree which "silence" was referenced by the prosecution. It is certain that the jury was not aware of the two separate interests of Mr. Logue, nor was it aware of the complicated procedural history of this case. It had to rely on the prosecution for much of the factual development.

Whether Logue was actually an accuser in this case should not be determinative. The prosecutor told the jury that Logue was an accuser and argued that defendant would have confronted him had defendant been an innocent man. It was error requiring reversal under these facts to argue, on cross-examination and in closing, that defendant's failure to confront his accuser during a postarrest, post-*Miranda* situation evidences his guilt.

### III

Even were I to find that defendant's constitutional rights were not violated by the prosecution's questioning, I would still affirm the Court of Appeals ruling. Under MRE 403, evidence is properly excluded if its probative value is substantially outweighed by the danger of unfair prejudice. It is also excluded if it would result in confusion of the issues or a misleading of the jury. The evidence of defendant's "silence" was highly prejudicial and not probative.

Referring to the notion in *Doyle, supra* at 617, that "every post-arrest silence is insolubly ambiguous," I would hold that the prosecutor's remarks should have been stricken as too ambiguous to be useful. It is

unclear from the statements themselves which "silence" was actually being referenced · by the prosecutor. That fact became apparent during oral argument and is further shown by the space devoted to the issue in the majority opinion. Moreover, there are reasons having nothing to do with guilt that would explain why a defendant might not confront his accuser directly outside a courtroom. A defendant might be afraid of the accuser. A defendant might be prevented by the court from contacting the accuser, or think that he would get into more trouble by confronting him. A defendant might not trust his control over his own emotions should he confront his accuser. Lastly, and most probably, a defendant might correctly reason that a confrontation would be of no benefit to him. It seems highly unlikely that Logue would have recanted his story had defendant confronted him and accused him of lying. Nothing in defendant's silence would tend to prove defendant's guilt or credibility.

On the other hand, given the nature of the prosecutor's closing arguments, this evidence was highly prejudicial to defendant. The prosecutor argued that defendant's failure to confront Logue was substantive evidence of his guilt because an innocent person would have let nothing stand in his way. There would have been "no bars strong enough" to have stopped him from rushing out to demand that Logue recant. The argument could well have tipped the scale in the prosecution's favor, given that this was a close case.

Public policy also supports a finding that the prosecutor acted improperly here. A finding in the prosecutor's favor signals other defendants that they must confront their accusers or risk having the same

tactic used against them. This Court should not condone such a confrontational necessity. The risk of spontaneous violence is too great to justify so small a return.

IV

I would not find the error harmless. Because I conclude that the reference to defendant's silence during his post-arraignment lock up in 1999 violates the federal constitution, the proper standard of review is governed by federal law. *Chapman v California*, 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967); *People v Anderson (After Remand)*, 446 Mich 392, 404; 521 NW2d 538 (1994). The standard to be applied for unpreserved and preserved nonstructural[5] constitutional error is the same: A reviewing court should affirm a defendant's conviction if it is satisfied that the error is harmless beyond a reasonable doubt. *People v Graves*, 458 Mich 476, 482; 581 NW2d 229 (1998).

Application of this standard to "trial type" constitutional errors was recently reaffirmed in *Brecht v Abrahamson*, 507 US 619, 630; 113 S Ct 1710; 123 L Ed 2d 353 (1993). *Brecht* contrasted the standard of harmless error review to be applied between requests for habeas corpus relief and direct appeals. It noted that there are " 'some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless.' " *Id.* at

---

[5] Structural constitutional error requires automatic reversal. *People v Graves*, 458 Mich 476, 482; 581 NW2d 229 (1998), citing *People v Anderson, supra* at 406.

630, citing *Chapman, supra* at 22. The state bears the burden of proving that the error was harmless beyond a reasonable doubt. *Brecht, supra* at 630. In the particular setting of this case, the prosecution has failed to meet its burden.

Contrary to the majority's holding, the evidence against defendant was anything but overwhelming. The case against him depended to a great degree on the credibility of both defendant and Logue, as evidenced by the earlier dismissal of charges against defendant. Logue had every reason to falsely accuse defendant, given the benefits he hoped to obtain concerning his own criminal prosecution.

Moreover, the other evidence was circumstantial to a great degree. Defendant's fingerprints were found not on the cocaine baggie itself, but on a foil box that defendant claimed Logue stole while a guest in defendant's home. The police testimony concerning defendant's activities on the night in question was consistent with defendant's testimony. He maintained that Logue had invited defendant and Mr. Boyle to a party, but had told them he must first conduct unrelated business at a motel. Defendant's behavior, as observed by the police officer, was not inconsistent with innocence.

In short, nothing presented by the prosecution indicates that this constitutional error was "harmless" or "insignificant" beyond a reasonable doubt. I would affirm the Court of Appeals decision and remand for a new trial consistent with this opinion.

BRICKLEY and CAVANAGH, JJ., concurred with KELLY, J.