*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LAURA LYNN BERMUDEZ,

        Defendant-Appellant.

UNPUBLISHED
January 18, 2024

No. 363908
Delta Circuit Court
LC No. 22-010675-FH

Before: REDFORD, P.J., and RIORDAN and FEENEY, JJ.

PER CURIAM.

A jury found defendant guilty of operating a motor vehicle while visibly impaired, third offense, MCL 257.625(3); MCL 257.625(11)(c). The trial court sentenced defendant to serve 10 months in jail and 24 months' probation. Defendant appeals by right. We affirm.

## I. BACKGROUND

Defendant testified that on February 3, 2022, Wade Tatrow offered to give her a ride from Hannahville to Escanaba, where they went to a house and consumed alcoholic beverages. Defendant testified that when she left the room, she heard Tatrow talking with his friends about how beautiful she was and how they should give her more alcohol. Defendant believed this meant he was hoping that she "got intoxicated" so he could "take advantage" of her and rape her.

Defendant testified that she asked Tatrow to take her home and that he agreed, but rather than take her home, he took her to a bar. When they left the bar, Tatrow told defendant he was bringing her home, but he started driving in a direction unfamiliar to defendant. According to defendant, Tatrow ignored her pleading to be brought home. Defendant testified that she started growing fearful because Tatrow had verbally threatened her in the past, once making a threat that she "would go missing and no one would care." Defendant testified that, while Tatrow drove, she thought about how she could get home safely to her kids and about where she could jump out of the van.

Eventually, defendant noticed a police car nearby. Defendant testified that she first attempted to get the officer's attention by reaching past Tatrow to turn on and off the van's turn signal. Defendant testified that, when this proved unsuccessful, she grabbed the van's steering wheel and purposefully turned the vehicle into a ditch to get the officer's attention. Delta County Sheriff's Deputy Chad Newton testified that, when stopped at a red light at an intersection, he saw a van approaching and observed defendant reach over, grab the steering wheel with both hands, turn the van to the right and put it in the snowbank in the ditch. Deputy Newton activated his emergency lights and requested backup. Delta County Sheriff's Deputies James McDonough and Joshua Simmons both responded.

Deputy Newton made initial contact with Tatrow, and ultimately arrested him for operating while intoxicated. Defendant testified that after she saw Tatrow interacting with police, she regretted turning the van into the ditch because she believed these officers had a special relationship with Tatrow. Defendant testified that Tatrow acted "chummy" with the officers and was permitted to smoke cigarettes at the scene. Both Deputy Simmons and Deputy Newton testified that they treated Tatrow just as they would treat any other person in this situation and that Tatrow did not smoke any cigarettes.

Deputy Newton approached defendant while she was still in the van. According to Deputy Newton, defendant had "bloodshot and watery eyes, and at times her speech was slurred when she was speaking, and I also observed an open container of alcoholic beverage in the vehicle." Defendant admitted that an open container in the vehicle belonged to her. Deputy Newton asked defendant why she grabbed the wheel, but she did not respond directly beyond asking him to contact a police officer from Hannahville. Deputy McDonough asked defendant how she knew Tatrow, and she told him that she met him that day when he picked her up hitchhiking. Deputy McDonough testified that, when he asked defendant how she and Tatrow ended up in the ditch and whether they had been in an argument, she told him, "No. That she was drunk." Defendant attempted to go see Tatrow on multiple occasions throughout the stop and told officers that she wanted to give him a hug. Moreover, defendant told officers that she loved Tatrow, that she would do anything for him, that he was never rude but was a "good guy," and that it had been her fault rather than Tatrow's. Deputy Newton ultimately arrested defendant for operating while intoxicated. Defendant was charged with operating a vehicle while intoxicated, third offense, and operating a motor vehicle with a suspended license. The prosecution dismissed the count of operating a motor vehicle with a suspended license.

Before trial, defendant filed a motion in limine requesting that the trial court bar admission of any evidence regarding her prearrest silence because it was irrelevant and it would not have been natural for her to speak to police about her duress. The prosecution disagreed, arguing that the evidence of her prearrest silence had relevance to her duress defense and should be admissible. The trial court held a hearing on defendant's motion and denied it. The trial court ruled that defendant's prearrest omissions constituted "a statement on her part insofar as her failure to assert a material fact could amount to an assertion or statement of the nonexistence of the fact." Accordingly, defendant's failure to disclose the facts of her duress amounted to an omission rather than silence and was admissible for its relevance to her duress defense.

Defendant did not dispute that she grabbed the steering wheel or that she had consumed alcohol. Instead, defendant raised the affirmative defense of duress, arguing that she had been

afraid of Tatrow and had grabbed the steering wheel in order to gain the attention of police. Regarding her conduct at the scene, she testified that she acted that way to remain in Tatrow's "good graces" because she feared him. According to defendant, Tatrow had previously bragged to her "about his power with the cops." She testified that after seeing Tatrow's "special relationship" with the officers at the scene, she essentially reconsidered her decision to try and gain the attention of police. Defendant testified that she did not trust the officers. During defendant's cross-examination, the following exchange occurred between the prosecution and defendant:

> *Q.* Okay. And when you first had contact with law enforcement when you were still seated in the [van], you didn't tell them you were scared of him?

> *A.* Correct.

> *Q.* You told one of the officers, I didn't even—you didn't even know who he was?

> *A.* Correct

> *Q.* That he picked you up hitchhiking?

> *A.* Correct.

> *Q.* You weren't crying at that point?

> *A.* Correct.

> *Q.* When you got to the hospital, you told the officers on a couple occasions you wanted to bond him out?

> * * *

> *A.* Yes.

> *Q.* Okay. And the whole thing was your fault?

> *A.* Yes.

After hearing defendant's testimony and the parties' arguments regarding the duress defense outside the presence of the jury, the trial judge found that defendant met her prima facie standard to assert a duress defense. During closing arguments, the prosecution made the following remarks regarding defendant's interactions with the police during the incident:

> In [Deputy Newton's] talking with the defendant, he was trying to figure out what was occurring. She wasn't really answering him. He asked her point blank, why'd you grab the steering wheel? She didn't answer.

> * * *

-3-

Now, during the course of that two, two and a half hours that officers were with the defendant, she makes no mention and there was no testimony of her being threatened by Mr. Tatrow. She makes a lot of statements about Mr. Tatrow, but at no time during that entire time period, did she specify that Mr. Tatrow threatened her, she was scared of Mr. Tatrow, there was anything wrong with her relationship or what had just occurred because of Mr. Tatrow.

* * *

But again, we have somebody who on the day of the incident in the face of multiple law enforcement officers, separated from her would be threatener (sic), never says a word to law enforcement. Never provides that explanation despite being asked.

* * *

Common sense, what makes sense to you? That someone is so scared of the person who's driving this vehicle she feels she needs to drive it into a snowbank to get officers' attention, but then doesn't say a word to those officers about why she did it. Does that make sense? Does that fit with your perception of what common sense is? Doesn't say a word in the first five minutes.

The jury found defendant guilty of operating a motor vehicle while visibly impaired, a lesser included offense. This appeal followed.

## II. ANALYSIS

Defendant argues that the trial court abused its discretion by admitting evidence of defendant's prearrest silence at trial. In particular, defendant challenges Deputy Newton's testimony that defendant remained silent when he asked her why she grabbed the steering wheel. Defendant argues that this evidence was not relevant, even for impeachment purposes, because it would not have been natural for her to tell local police that she felt threatened when she believed that Tatrow had a special relationship with the officers. We disagree.

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012) (opinion by M. B. KELLY, J.). A trial court abuses its discretion when it selects an outcome falling outside the range of principled outcomes. *Id*. "A trial court necessarily abuses its discretion when it makes an error of law." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted). We review "de novo constitutional questions and issues of law underlying evidentiary rulings." *Kowalski*, 492 Mich at 119.

The Fifth Amendment to the United States Constitution protects a defendant from being "compelled in any criminal case to be a witness against himself." US Const, Am V. "The Fifth Amendment has been made applicable to the states through the Due Process Clause of the Fourteenth Amendment." *People v Clary*, 494 Mich 260, 265; 833 NW2d 308 (2013). Under the Fifth Amendment and *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), "in order to protect the privilege against compelled self-incrimination during custodial police interrogations, the suspect 'must be warned that he has a right to remain silent [and] that any

statement he does make may be used as evidence against him . . . .' " *Clary*, 494 Mich at 265 (alterations in original). Further, the prosecution may not use such *postarrest* silence against the defendant at trial. *Id.*

The United States Supreme Court however has held that the use of a defendant's *prearrest* silence to impeach her credibility does not violate the Fifth Amendment. *Jenkins v Anderson*, 447 US 231, 238-239; 100 S Ct 2124; 65 L Ed 2d 86 (1980). Similarly, in *People v Cetlinski (After Remand)*, 435 Mich 742, 746-747; 460 NW2d 534 (1990), our Supreme Court held that "the use for impeachment purposes of a defendant's prior statement, including omissions, given during contact with the police, prior to arrest or accusation, does not violate the defendant's constitutional rights as guaranteed under the Fifth and Fourteenth Amendments or the Michigan Constitution." See also *Clary*, 494 Mich at 266. As the Court explained in *Cetlinski*:

> [A]s an evidentiary matter, omissions from an affirmative voluntary response to questions about the same subject matter testified to at trial do not constitute "silence." Rather, they are "prior inconsistent statements," and can be used to impeach testimony at trial in which the witness admitted the fact's existence.
>
> *  *  *
>
> [W]hen an individual has not opted to remain silent, but has made affirmative responses to questions about the same subject matter testified to at trial, omissions from the statements do not constitute silence. The omission is nonverbal conduct that is to be considered an assertion of the nonexistence of the fact testified to at trial if a rational juror could draw an inference of inconsistency. [*Cetlinski*, 435 Mich at 748-749 (citation omitted).]

Our Supreme Court further explained that the use of "such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts." *Id.* at 748 (quotation marks omitted), quoting *Jenkins*, 447 US at 238.

Whether the use of a defendant's prearrest, pre-*Miranda* statements and omissions is proper for impeachment is a question of relevancy. *Cetlinski*, 435 Mich at 747. See also *People v Hackett*, 460 Mich 202, 214; 596 NW2d 107 (1999). "The threshold inquiry is whether this evidence makes 'the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Cetlinski*, 435 Mich at 747 (citation omitted). See also MRE 401 and 402. "[N]onverbal conduct by a defendant, a failure to come forward, is relevant and probative for impeachment purposes when the court determines that it would have been 'natural' for the person to have come forward with the exculpatory information under the circumstances." *Id.* at 760 (citation omitted). Therefore, "where the prosecutor's theory of impeachment is that the defendant is not telling the truth because he did not come forward and offer what he now testifies to," it is proper for trial court to allow "impeachment if it would have been *natural and expected* for the defendant to come forward with the story he relates during trial." *Id.* at 761 (emphasis added).

In this case, it would have been natural and expected for defendant to inform police about her duress. Her omissions to the officers were highly relevant to her defense of duress. Defendant

did not dispute the allegations that she consumed alcohol or that she grabbed the wheel and turned the van into the snowbank. In fact, she admitted to both allegations in her trial testimony to raise a duress defense. Defendant argued at trial that she turned the wheel under duress because she feared Tatrow and specifically *wanted* to get the police's attention. Once the officers arrived, however, defendant failed to inform them about any fear, threats, or duress. If defendant grabbed the steering wheel specifically to get the police's attention, it seems only "natural" that she would have informed the police officers. See *Cetlinksi*, 435 Mich at 761.

In addition to these omissions, defendant made several statements, both verbal and nonverbal, to officers about Tatrow and their relationship that contradicted her duress testimony at trial. She told officers at the scene that she wanted to give Tatrow a hug, that they were not arguing, that she loved him and would do anything for him, that he was never rude and a "good guy," and that it had been her fault rather than Tatrow's. Likewise she attempted to go to Tatrow on multiple occasions during the officers' investigation of the incident, told officers that she did not previously know Tatrow and that she had met him that day when he picked her up while hitchhiking. Defendant's conduct and statements at the scene were contradictory but also conflicted with her later trial testimony.

Defendant's prearrest omissions had a direct bearing on whether her claim of duress was more or less probable than it would be without this evidence: if defendant's claim of duress was true, she likely would have told police that she feared and felt threatened by Tatrow. Therefore, defendant's failure to tell officers attending the scene about her duress had relevance to her credibility regarding her duress defense and the trial court properly admitted the evidence for impeachment purposes.

Moreover, the prosecution did not proffer defendant's silence during the incident as proof of guilt of the underlying charge, but rather as evidence respecting her credibility regarding the duress defense. The evidence indicated that defendant did not come forward and state to police what she testified to at trial. Defendant's conduct at the scene also indicated a relationship with Tatrow that differed significantly from that which she later testified to at trial. Defendant's failure to tell officers that she felt threatened and under duress constituted a prearrest omission. See *Cetlinski*, 435 Mich at 748-749.

Defendant also challenges the prosecution's closing remarks discussing her prearrest omissions. The record reflects that the prosecution did not improperly use prearrest silence. The prosecution merely used the evidence of defendant's omission in closing argument to highlight defendant's inconsistencies and cast doubt on her credibility. The prosecution questioned defendant's veracity by pointing out that she never told officers she felt threatened despite testifying that she turned the wheel to initiate contact with officers. The prosecution also commented on defendant's affirmative statements about Tatrow and her failure to mention any threats or argument. The prosecution did not ask the jury to infer guilt from the defendant's silence, see *Cetlinski*, 435 Mich at 763, but merely emphasized that defendant spoke and acted in a manner uncharacteristic of a person in such situation under threat and duress which contradicted

her duress defense at trial. The prosecution properly presented admissible evidence to impeach defendant's credibility while leaving the ultimate question of guilt for the jury's determination.

Affirmed.

/s/ James Robert Redford
/s/ Michael J. Riordan
/s/ Kathleen A. Feeney