

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-19-2007

# McCracken v. Freed

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1510

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"McCracken v. Freed" (2007). *2007 Decisions.* Paper 918.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/918

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO:  06-1510

———————

E. JEAN McCRACKEN; TED A. McCRACKEN,
Appellants

v.

ROBERT A. FREED, Chief of Police, Upper Gwynedd Township Police Department, sued in his individual and official capacities; JOHN DOE I, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Hatfield Township Police Department, sued in his individual and official capacities; HATFIELD TOWNSHIP; JOHN DOE II, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Horsham Township Police Department, sued in his individual and official capacities; HORSHAM TOWNSHIP; JOHN ROE, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Borough of Lansdale Police Department, sued in his individual and official capacities; BOROUGH OF LANSDALE; JOHN ROE I, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Lower Gwynedd Township Police Department, sued in his individual and official capacities; LOWER GWYNEDD TOWNSHIP; JOHN ROE II, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Montgomery Township Police Department, sued in his individual and official capacities; MONTGOMERY TOWNSHIP; JOHN ROE III, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Borough of North Wales Police Department, sued in his individual and official capacities; BOROUGH OF NORTH WALES; JOHN ROE IV, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Towamencin Township Police Department, sued in his individual and official capacities; TOWAMENCIN TOWNSHIP; JOHN POE, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Upper, Gwynedd Township Police Department, sued in his individual and official capacities; JOHN POE I, Commander, Upper Gwynedd Township Police Department, sued in his individual and official capacities; JOHN POE II, Supervisor, Upper Gwynedd Township Police Department, sued in his individual and official capacities; UPPER GWYNEDD TOWNSHIP; JOHN ROE V, Police Commando, Special Weapons and Tactics Unit, North Penn Task Force, Whitpain Township Police Department, sued in his individual and official capacities; WHITPAIN TOWNSHIP; JAMES PIFER; STEVEN FORD; STEPHEN GILLEN; SCOTT CLARK; FREDERICK LYNCH; JOHN COTTRONE; MICHAEL PAUL; PATRICK HANRAHAN; JOHN CIARELLO;

STEVEN CAMERON; JUSTIN DIBONAVENTURA; DAVID GORI; CHRISTINE BUTLER; COREY MOYER; VINCENT MEDVEKUS; RYAN DEVLIN; THOMAS LAWSON; BENJAMIN TOWNSEND; JOHN BRINKMAN; WILLIAM K. CHAPMAN

---

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 03-cv-04923)
District Judge: Honorable Timothy J. Savage

---

Submitted Under Third Circuit L.A.R. 34.1(a)
December 19, 2006

Before: BARRY, CHAGARES AND ROTH, <u>CIRCUIT JUDGES</u>

(Filed: June 19, 2007)

---

OPINION

---

PER CURIAM

On August 28, 2001, armed members of the North Penn Area Tactical Response Team ("the TRT"), wearing gas masks, burst into the home of Eunice McCracken and arrested her son Ted McCracken. The McCrackens claim that the TRT used excessive force in the arrest. They both appeal the District Court's order granting the Defendants' motions for summary judgment. We will affirm.

**I.**

On August 28, 2001, at approximately 11:30 a.m., six police officers from the Upper Gwynedd Police Department went to Mrs. McCracken's home in North Wales, Pennsylvania, to serve an arrest warrant issued on August 17, 2001, for Mr. McCracken. Mr. McCracken had moved into his mother's house after residing for a short period in Maryland. The affidavit of probable cause specified that Mr. McCracken was a sex offender required to register his address with the New York State authorities. He failed to do so. The officers were also serving a misdemeanor warrant for McCracken's arrest for loitering at night.

Detective James Pifer, the officer responsible for investigating the registration offense, explained that upon arriving at the McCrackens' house, Sergeant Gillen knocked on the door. He also described that Officer Lynch announced that they were the police and wanted to talk to Mr. McCracken. Pifer, in his deposition, testified that:

> [Mr. McCracken] made contact with [Lynch], visually. Next thing we know, the door is being bolted shut. Some things sounded like they were being slid. And we felt that we had a barricade situation going on. At that point, for the safety of the citizens, the safety of the officers, the possible fact that with what happened to your [McCracken's] mother, we didn't know what was going on, we backed off and called the Chief because we felt at the time we had a barricaded subject and needed the tactical team.

(Pifer Dep., Docket # 110 Ex. B. 17:18–18:1, Nov. 12, 2004.)[1]

---

[1] After the TRT had entered the home, TRT member Patrick Hanrahan noted that "[t]he front door of the residence was barricaded with furniture so that the front door could not be opened." (Supp. App. of Freed et al. at 119a.) However, Mr. McCracken claims that he never barricaded the door.

McCracken explained that he heard a knock, but was typing at the time so it took him a few minutes to get to the door. He checked the locks, but did not answer because he contends that the police did not announce their purpose. (App. at 318-319.)[2] Mrs. McCracken also stated that she heard a knock and checked the door. However, she stated that when she got to the door, the officers were leaving and she assumed it was nothing important. (Id. at 319-320.)

Upon retreating from the house, the officers called Upper Gwynedd Police Chief Robert Freed. Freed recalled in his affidavit that:

> I knew Mr. McCracken had been arrested for rape, forced sodomy, and attempted murder in the State of New York in 1977. . . . While out on bail on that charge, I knew that Mr. McCracken again raped, attacked, and attempted to kill the same woman. . . . I knew that Mr. McCracken was convicted of the charges and served nearly 20 years in prison in New York. . . . I knew that Mr. McCracken had pending weapons charges against him in the State of Maryland. Specifically, I knew that he had been arrested for carrying a concealed black powder gun in a bank.[3]

(Supp. App. Robert Freed, et al. at 69a.)

Freed was unsure whether Mrs. McCracken was in the residence. He knew that four years prior to the incident, Mrs McCracken filed an assault charge against her son for allegedly choking her neck. However, Mrs. McCracken refused to pursue the issue and

---

[2] Detective Pifer could not recall whether Sergeant Gillen stated that they had a warrant. (Pifer Dep. 17:15-17).

[3] Freed also testified that the police believed that Mr. McCracken had previously reinforced the walls and ceiling of the house in order to act as a barricade. However, the "reinforcement" that Freed described was insulation, which officers had seen McCracken install previously when investigating a noise complaint. (App at 309.)

4

the charges were dropped. Freed decided that the information he possessed justified calling in the TRT.

The TRT arrived at the scene at 1:12 p.m. in tactical uniforms. (App. at 20; Supp. App. of Freed et al. at 70a.) Chief Freed also arrived at the scene, assuming command of operation. (App. at 80:17-25.) At 1:50 p.m. Sergeant Ford began placing phone calls to the residence. Over the course of thirty minutes, eighteen phone calls were placed. Fourteen calls resulted in a busy signal. The other four, including the first and last call, were picked up by an answering machine. Ford left messages asking Mr. McCracken "to please pick up," indicating that the officer "needed to speak with him." (Supp. App. of Freed et al. at 96a). The last call was placed at 2:18 p.m. <u>Id.</u>

Before actually raiding the house, Officer Cutrone, who responded with the TRT, explained that the team attempted to contact Mr. McCracken, using a public address system, sirens, as well as knocking on the front and back doors of the house, and shouting to get the McCrackens' attention. (Supp. App. of Freed et al. at 136a.) None of the depositions or affidavits identify to what extent these measures were used or at what times. While the TRT decided what to do, the Upper Gwynedd officers blocked off the street and evacuated residents from neighboring houses.

During the summary judgment hearing, Mr. McCracken explained that he was not aware of these efforts to contact him. He claimed that he was using the internet, which tied up the phone lines and resulted in the fourteen busy signals. He also claimed that he was unable to hear the commotion outside because the windows were closed and the air

5

conditioner was making a lot of noise. He did not hear the public address system until the moment that the TRT entered the house. (See App. at 325-27.)

Shortly after the last phone call was made, TRT officers stationed themselves in the front and rear of the house. According to the affidavits of the officers in the TRT, at roughly 2:38 p.m., TRT officers broke the front windows and delivered two Oleoresin Capsicum ("pepper spray") canisters through the front windows of the home; only one of the canisters discharged. (Supp. App. of Freed et al. at 119a). TRT Officer Cutrone then broke the sliding glass door in the rear of the house and entered the apartment with three other armed officers. (Supp. App. of Freed et al. at 117a.) Mr. McCracken was in the kitchen and was ordered to get to the floor, which he did. Id. Cutrone then placed Mr. McCracken in handcuffs, lifted him to his feet and escorted him out of the building. Id. Mrs. McCracken was in one of the bedrooms into which the pepper spray canisters were delivered. She testified that one of the officers pointed and held a rifle with a bayonet to her chest. She also testified that she received minor cuts from the broken glass. Mrs. McCracken refused treatment. Mr. McCracken was arraigned and held on the registration charge. The charge was eventually dismissed because the prosecution was unable to prove that McCracken received notice from the State of New York of his obligation to register.

In 2004, both Mr. and Mrs. McCracken filed suit under 42 U.S.C. § 1983 requesting monetary damages for the unlawful use of excessive force. The Defendants included a number of townships, police departments, and individual officers in both their

6

individual and official capacities.  On January 21, 2005, the District Court granted

summary judgment in favor of several local governments because none contributed any

personnel to the operation.  The remaining participating municipalities and the officers

involved filed a motion for summary judgment.

On January 6, 2006, the District Court granted the motion.  The District Court held

that the McCrackens failed to show that any of the townships had a policy, custom, or

practice that exhibited deliberate indifference to the McCrackens' constitutional rights.  It

held that the McCrackens' failure-to-train argument was without merit because the TRT

requires certification and training and the McCrackens failed to identify how this was

inadequate.  It also rejected the McCrackens' failure-to-equip theory.

With respect to the individual officers, the District Court concluded that under

Sharrar v. Felsing, 128 F.3d 810, 821-22 (3d Cir. 1997), the force used was not

"objectively unreasonable."  The Court analyzed the alleged deprivation of Mr. and Mrs.

McCracken under the same theory.  Directing the majority of its attention to Chief Freed,

the District Court held that no rational jury could conclude that Freed applied the Sharrar

factors in an unreasonable manner in deploying and directing the TRT team.  It then held

that Freed was entitled to qualified immunity because "[e]ven if [Freed's] decisions and

those acting upon them were objectively unreasonable, a reasonable officer would not

have thought his conduct was unlawful."  McCracken v. Freed, No. 03-4923, slip op. at

23 (E.D. Pa. Jan. 6, 2006).

7

We have jurisdiction pursuant to 28 U.S.C. § 1291 and exercise plenary over an order granting a motion for summary judgment.  See Kelly v. Drexel University, 94 F.3d 102, 104 (3d Cir. 1996).  In evaluating the evidence, we take the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor.  Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003).  Summary judgment is appropriate when the record shows that there is no need of a trial because "there is no genuine issue of material fact and []the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); Celotex Corp. v. Cattrett, 477 U.S. 317, 322 (1986).

**II.**

The McCrakens filed a pro se notice of appeal challenging a number of the District Court's orders, but only the order granting the Defendants' motions for summary judgment is sufficiently meritorious to deserve our attention.[4]  We begin by noting that

---

[4] The McCrackens also argue that the District Court abused its discretion by denying their motion to amend and failing to issue a default judgment against the Borough of North Wales.  We review both orders for abuse of discretion.  See Garvin v. City of Philadelphia, 354 F.3d 215, 219 (3d Cir. 2003) (motion to amend); Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000) (default judgment).  The McCrackens' motion to amend was granted with respect to providing names for the unknown officers named in the original complaint.  The remaining portion of the motion was designed to allege a conspiracy relating to an insurance settlement.  Other than the coincidence of timing, the McCrackens do not allege any facts that would support the assertion of a conspiracy.  With respect to the default judgment, a delay in responding does not necessarily require the entry of a default judgment.  See Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1147-48 (3d Cir. 1990).  In considering that North Wales filed its response before the motion for a default judgment was even filed, and examining the factors in Poulis v. State Farm Fire and Cas. Co., 747 F.3d 863, 868 (3d Cir. 1984), we conclude that the District Court did not abuse its discretion.  The remainder of the McCrackens arguments are either related to the issue of summary judgment or are unintelligible.

the District Court properly granted summary judgment to the municipalities whose officers were part of the TRT's action.

Under Monell v. Dep't of Social Services if City of New York, 436 U.S. 658, 694 (1978), § 1983 does not provide municipal liability under the theory of respondeat superior. Accordingly, the McCrackens rest their claims against the municipalities on the theory that the townships provided constitutionally inadequate training and failed to equip the TRT with non-deadly ordnance.

The McCrackens' failure-to-equip claim is clearly without merit because the TRT *was* equipped with non-lethal ordinance, namely the pepper spray canisters. Further, even if the members of the TRT were inadequately equipped, there was no constitutional violation. See Carswell v. Borough of Homestead, 381 F.3d 235, 245 (3d Cir. 2004) ("[W]e have never recognized municipal liability for a constitutional violation because of failure to equip police officers with non-lethal weapons.")

The McCrackens have also provided no evidence to support their failure-to-train claim. All of the TRT members had been certified for the TRT and participated in monthly trainings. (App. at 180.) Further, the McCrackens provide no argument as to why this training regime shows "deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 389

(1989).[5]  Accordingly, the municipal Defendants were entitled to judgment as a matter of law.

## III.

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 394 (1989); Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004).  However, the Fourth Amendment applies to Mrs. McCracken only if she was the subject of a seizure.  See County of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998).

A Fourth Amendment seizure involves "a termination of freedom of movement through means intentionally applied." Brower v. County of Inyo, 489 U.S. 593, 596 (1989).  "A seizure occurs even when an unintended person or thing is the object of the detention or taking." Id.  However, the detention must be intentional, and "not the accidental effect[] of otherwise lawful government" conduct. Id. at 597; see also Childress v. City of Arapaho, 210 F.3d 1154, 1157 (10th Cir. 2000) (holding that accidental injuries inflicted on a hostage during the course of an arrest did not constitute a seizure).  According to the Brower Court, the inquiry is not whether every consequence of

---

[5] Further, as we explain below, the individual officers did not violate the Plaintiffs' constitutional rights.  Thus, any failure to train would not be "the moving force of [a] constitutional violation" actionable under § 1983.  See Polk v. Dodson, 454 U.S. 312, 326 (1981).

10

the use of force was intended; rather it concluded that "[w]e think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place to achieve that result."  Id. at 599.

Mrs. McCracken was seized by the TRT when the team members threw the pepper spray canisters into the house.[6]  See Logan v. City of Pullman, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005) (finding the intentional spraying of pepper spray into the first floor of a building was a seizure of those located on that floor).  The TRT deployed the pepper spray canisters with the intent of temporarily debilitating any persons occupying the home.  They had knowledge that Mrs. McCracken might have been home and still deployed the canisters.  Mrs. McCracken's freedom of movement was terminated by the pepper spray canisters, and those canisters were the instrumentality that the TRT had decided to use to incapacitate the occupants of the house.  See In re City of Philadelphia Litigation (Philadelphia I), 49 F.3d 945, 974 (3d Cir. 1995) (Scirica, J. concurring); see also In re City of Philadelphia Litigation (Philadelphia II), 158 F.3d 711, 722 (3d Cir. 1998).

In deciding whether challenged conduct constitutes excessive force, a court must determine the objective "reasonableness" of the challenged conduct.  Graham, 490 U.S. at 396.  In evaluating reasonableness, a court must take into consideration the fact that "police officers are often forced to make split-second judgments – in circumstances that

---

[6] However, it does not appear that Mrs. McCracken was seized by the mere activation of the TRT, as there was no warrant for her arrest and the TRT was not activated with the intention of preventing her from leaving the house.

11

are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 397. Thus, the court should not apply "the 20/20 vision of hindsight," but should instead consider the "perspective of a reasonable officer on the scene." Id. at 396.

The ultimate question in this case is whether Chief Freed's decision to activate the TRT and the TRT's subsequent actions were objectively reasonable responses to the situation.[7] See Estate of Smith v. Marasco, 318 F.3d 497, 517 (3d Cir. 2003). The factors that a court should consider in judging the reasonableness of the use of force are: 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officer or others; 3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; 4) the duration of the officers' action; 5) whether the action takes place in the context of effecting an arrest; 6) the possibility that the suspect may be armed; 7) the number of persons with whom the police officers must contend at one time; and 8) whether the force applied was of such an extent as to lead to injury. Sharrar, 128 F.3d at 822.

Considering all of the relevant facts in the light most favorable to the Plaintiffs, we cannot say that the activation of the TRT or the use of pepper spray canisters and the entry into the McCrackens' home was unreasonable. Although the crimes for which the police sought to arrest Mr. McCracken – loitering and failure to register under Megan's

_____

[7] Because Mrs. McCracken was not seized until the TRT threw the pepper spray canisters into the house, only Mr. McCracken's Fourth Amendment rights were implicated by Freed's decision to activate the TRT.

Law – were not particularly severe, the police could have reasonably believed that he posed a threat to them or to his mother. Mr. McCracken had been convicted of a serious, violent crime, and there were pending charges against him for possession of a firearm. Further, Mrs. McCracken had previously filed an assault complaint against her son for choking her. It was objectively reasonable for the TRT to conclude that Mr. McCracken posed a threat.

Mr. McCracken was also clearly attempting to evade arrest, and the officers reasonably believed that he had barricaded himself in the home. When the police first approached to take him into custody, Mr. McCracken appeared to lock the front door and there were scraping noises as if he were barricading the front door. He did not respond to several messages on his answering machine. Finally, he did not respond when the police attempted to contact him later using the public address system and banging on the front and back doors.

Some of the other Sharrar factors are more ambiguous. The TRT had ample time to respond to the situation, and he was only one person against numerous well-armed police officers. However, due to his history of violence and pending weapons charge, it was reasonable to believe that he might be armed. Further, the police were attempting to take him into custody on the authority of two arrest warrants.

Based on this analysis, it is clear, as a matter of law, that Chief Freed was not unreasonable in activating the TRT, ordering the entry, or approving of the entry and use of the pepper spray canisters. At the time the TRT was activated, the police had already

identified themselves to Mr. McCracken. In response, Mr. McCracken locked, and made sounds suggesting that he had barricaded, his front door. There was also the possibility that he was holding his mother against her will in the house. By the time the TRT made their entry, several messages had been left and TRT announcements made on the public address system. Thus, it was objectively reasonable for the TRT to believe that the only way that it would be able to effectuate Mr. McCracken's arrest was through a forced entry.

The force used by the TRT to incapacitate the McCrackens during the TRT's entry was also not unreasonable. As noted, the officers reasonably believed that Mr. McCracken posed a danger to them and, perhaps, to his mother. Even though pepper spray is a dangerous chemical which causes severe pain and can, in some cases, lead to serious injury, see United States v. Neill, 166 F.3d 943, 949 (9th Cir. 1999), it is not deadly force. Further, upon being taken into custody, both Plaintiffs were immediately offered treatment for any injuries resulting from their exposure to the pepper spray.

Because there was no genuine issue of material fact and the individual Defendants were entitled to judgment as a matter of law, the District Court was correct in granting Defendants' motions for summary judgment. Accordingly, we will affirm the judgment of the District Court.