RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 09-2359

*v.*

KYLE MOSLEY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 08-00009-001—Robert Holmes Bell, District Judge.

Argued: January 18, 2011

Decided and Filed: March 29, 2011

Before: BOGGS, MOORE and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Richard D. Stroba, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. R. Clay Stiffler, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Richard D. Stroba, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Christopher M. O'Connor, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. In 2004, the State of Michigan convicted Kyle Mosley of shooting pepper spray at a person without justification. Mich. Comp. Laws § 750.224d(2). At issue in this case is whether that conviction amounts to a "crime of

violence" under § 2K2.1(a) of the sentencing guidelines.  We conclude that it does, and for this reason (and three others) we affirm.

## I.

In 2008, Mosley pleaded guilty to being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1).  At sentencing, the district court treated Mosley's prior conviction for resisting and obstructing arrest as a crime of violence, raising his offense level to 21. That, together with his criminal history (VI), generated a 77–96 month guidelines range, and the court sentenced him to 96 months.  On appeal, we vacated the sentence, holding that resisting and obstructing a police officer under Michigan law is not categorically a crime of violence.  *United States v. Mosley*, 575 F.3d 603, 608 (6th Cir. 2009).

At his re-sentencing hearing, the district court considered whether, in the alternative, Mosley's 2004 pepper-spray conviction amounted to a crime of violence. After concluding that it did, the court re-sentenced Mosley to 96 months.

## II.

The guidelines define a "crime of violence" as "any offense under federal law or state law, punishable by imprisonment for a term exceeding one year" that either (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another" or (2) "is burglary of a dwelling, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another*."  U.S.S.G. § 4B1.2(a) (emphasis added); *see* U.S.S.G. § 2K2.1(a).  In considering whether a state conviction comes within the residual clause, italicized above, "we look at the statutory definition of the crime of conviction, not the facts underlying that conviction, to determine the nature of the crime."  *United States v. Ford*, 560 F.3d 420, 421–22 (6th Cir. 2009).  Not "every conceivable factual offense covered" by the law must raise "a serious potential risk of injury."  *James v. United States*, 550 U.S. 192, 208 (2007).  It is enough that "the conduct encompassed by the elements of the offense, in the ordinary case," presents such a risk.  *Id.*

The Michigan pepper-spray law says that "a person who uses a self-defense spray or foam device to eject, release, or emit orthochlorobenzalmalononitrile or oleoresin capsicum at another person is guilty of a misdemeanor, punishable by imprisonment for not more than 2 years," M.C.L. § 750.224d(2), except "under circumstances that would justify the person's use of physical force," *id.* § 750.224d(5)(b).  In our view, this offense amounts to a "crime of violence."

In the first place, the Michigan law imposes a more-than-one-year punishment. Mosley does not argue otherwise.

In the second place, the law satisfies (at a minimum) the residual clause of the second prong of the crime-of-violence definition because it "otherwise involves conduct that presents a serious potential risk of physical injury to another."  U.S.S.G. § 4B1.2(a)(2).  (We express no view on whether the law also "has as an element the use . . . of physical force," *id.* § 4B1.2(a)(1).)  Pepper spray not only has the potential to cause physical injury, but that is the very point of the device:  It is "*designed* to cause intense pain." *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated on other grounds by* 534 U.S. 801 (2001).  Why would something that operates effectively as a self-defense shield by "caus[ing] extreme pain and prolonged impairment of bodily organs," *United States v. Melton*, 233 F. App'x 545, 547 (6th Cir. 2007), not amount to a crime of violence when used as a sword in the exact same way?

Known as oleoresin capsicum or OC, the active ingredient of pepper spray is an "oily extract" from pepper plants found primarily in Africa, India, Japan and Mexico. C. Gregory Smith & Woodhall Stopford, *Health Hazards of Pepper Spray*, 60 N.C. Med. J. 268, 268 (1999).  When distilled to create a heavy dose of capsaicin, pepper spray incapacitates its victims. *Melton*, 233 F. App'x at 547.

The clinical explanation for this effect adds little to the discussion. Pepper spray, one medical journal tells us,

alters the neurophysiology of sensory neurons in the airway mucosa by inducing the release of tachykinins or neuropeptides like substance P and neurokinin A. These induce neurogenic inflammation in airway blood vessels, epithelium, glands, and smooth muscle, leading to vasodilation, increased vascular permeability, neutrophil chemotaxis, mucus secretion, and bronchoconstriction.

Smith & Stopford, *supra*, at 269. Try this, however: pepper spray may range from 400 to 1,000 times hotter than a jalapeno. People measure the "hotness" of peppers in Scoville units. *Id.* at 268. A jalapeno comes in at around 5,000 Scoville units, and a habanero can reach up to 200,000. *Id*. According to the Guinness Book of World Records, the world's hottest pepper is the "Naga Viper," grown in the United Kingdom, which reached 1,382,118 Scoville units. "Hottest Chili," Guinness World Records, http://www.guinnessworldrecords.com/Search/Details/Hottest-chili/49118.htm (last visited Mar. 25, 2011). The capsaicin found in pepper spray routinely reaches 2 million Scoville units, and at least one commercially available brand boasts a 5.3 million Scoville unit resin. Fabrice Czarnecki, *Chemical Hazards in Law Enforcement*, 3 Clinics in Occupational & Envtl. Med. 443 (2003). Even when diluted, these resins can lead to "[s]erious adverse health effects, even death." Smith & Stopford, *supra*, at 272.

This helps to explain why pepper spray can "cause extreme pain and prolonged impairment of bodily organs. The spray burns the face [and] nostrils, restricts breathing passages, and causes blindness." *Melton*, 233 F. App'x at 547. It causes "a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx." *Headwaters Forest Def.*, 240 F.3d at 1199–200; *see also McCracken v. Freed*, 243 F. App'x 702, 710 (3d Cir. 2007) ("[P]epper spray is a dangerous chemical which causes severe pain and can, in some cases, lead to serious injury.").

Unjustified use of pepper spray in other contexts confirms that it poses a serious risk of physical injury. Its use may constitute excessive force in violation of the Fourth and Fourteenth Amendments. *See Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009); *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 34–35 (6th Cir. 2005); *Champion v. Outlook*

*Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004); *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994); *see also, e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010); *Headwaters Forest Def.*, 240 F.3d at 1200.  And courts have held that it "satisfies the requirements of a dangerous weapon," *see* U.S.S.G. § 2B3.1(b)(2)(D), because it "is 'capable of inflicting death or serious bodily injury.'" *United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999); *see also Melton*, 233 F. App'x at 547; *United States v. Bartolotta*, 153 F.3d 875, 879 (8th Cir. 1998).

Mosley responds that the law covers spray devices with a range of chemical-irritant  concentrations.  Because it remains possible to violate the statute even with a low concentration of chemicals, he argues that the offense does not involve conduct that presents a serious risk of physical injury.  But our duty is to focus on "the conduct encompassed by the elements of the offense, in the ordinary case," *James*, 550 U.S. at 208, not every case and assuredly not the exceptional case.  Mosley identifies no "self-defense spray or foam device," M.C.L. § 750.224d, that contains so little irritant that it poses little risk of physical injury.  In view of the customary purpose of pepper spray, it is hard to imagine why someone would produce a spray that has so few active ingredients that it will do little damage and harder still to imagine how such a product would be marketed.  The idea behind the device is not to produce a slight irritant to a mugger or a bear; it is to stop them both in their tracks by incapacitating them.

Mosley points out that the residual clause does not "cover[] *every* offense that involve[s] a substantial risk of" physical injury; it covers only those crimes that, like the enumerated offenses, involve "purposeful, violent, and aggressive conduct." *Begay v. United States*, 553 U.S. 137, 144–45 (2008).  Claiming that the Michigan law amounts to "a strict-liability offense," Mosley Br. at 27, he argues that it would cover an accidental spraying, which necessarily would not be "purposeful, violent, and aggressive conduct," *Begay*, 553 U.S. at 145.  Yet what matters, as shown, is "the ordinary case," *James*, 550 U.S. at 208, not the theoretical one, and the ordinary case implicates the requisite conduct. *Cf. United States v. Young*, 580 F.3d 373, 378 n.2 (6th Cir. 2009).

The possibility that an accidental spraying would lead to a conviction not only presents a remote risk, but it also appears to present a non-existent one. We know of no such conviction under the law, and Mosley for his part does not identify one either. That presumably is because, under Michigan law, "[c]riminal intent is ordinarily an element of a crime," even where "the Legislature did not expressly state that a defendant must have a criminal intent to commit [the] crime," *People v. Jensen*, 586 N.W.2d 748, 753 (Mich. Ct. App. 1998) (citing *People v. Rice*, 126 N.W. 981 (Mich. 1910)), and because "[s]tatutes creating strict liability regarding all their elements are not favored," *People v. Quinn*, 487 N.W.2d 194, 199 (Mich. 1992).

But what if the assailant, Mosley warns, misses his target? The triggering of the spray would still be covered by the law, he says, but how would it amount to purposeful, violent and aggressive conduct? Yet the same thing could be said about pulling a trigger on a gun (without hitting anyone), *see United States v. Ruvalcaba*, 627 F.3d 218, 225 (6th Cir. 2010), or many other attempted (but unsuccessful) intentional assaults. Whether in the one setting or the others, the attempt still contains the requisite *risk* of physical injury.

Mosley adds that Michigan's characterization of the law as a "misdemeanor," as opposed to a felony, shows that it does not present a serious potential risk of injury. Yet "whether a prior conviction is a crime of violence is a matter of federal law," not state law. *United States v. Anglin*, 601 F.3d 523, 527 (6th Cir. 2010); *see also Ford*, 560 F.3d at 423. The federal guidelines target "any offense," not just a felony, that is "punishable by imprisonment for a term exceeding one year" and that presents a serious risk of injury. U.S.S.G. § 4B1.2(a); *see id.* § 2K2.1(a). Nothing in the guidelines limits the enhancement to felonies, nor does anything in them permit a State's label on the crime to control the federal inquiry.

Mosley adds one other thing—that a carve out for misdemeanor convictions in § 921 of Title 18 applies to § 2K2.1(a)(3). Yet while there are many parallels between "violent felon[ies]" under the statute and "crimes of violence" under the guideline, this is not one of them. "[F]elony conviction," as used in § 2K2.1, is defined as "a prior

adult federal or state conviction for an offense punishable by . . . imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony." U.S.S.G. § 2K2.1 cmt. 1.  Section 4B1.2(a) says that "any offense under federal law or state law, punishable by imprisonment for a term exceeding one year," may be a crime of violence if it otherwise qualifies.  These are the provisions under which Mosley was sentenced, and they cover M.C.L. § 750.224d(2) by their terms.

The same is not so for the federal statutes.  True, the definition of "violent felony" in 18 U.S.C. § 924(e)(2)(B) is similar, covering "any crime punishable by imprisonment for a term exceeding one year."  True also, it contains an exception that otherwise would apply to the pepper spray statute:  "The term 'crime punishable by imprisonment for a term exceeding one year' does not include . . . any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less."  *Id.* § 921(a)(20)(B).  But § 921(a)(20)(B) applies only to the words "[a]s used in . . . chapter [44 of Title 18]," *id.* § 921(a), not to the guidelines in general or to § 2K2.1 in particular.  No similar language in the relevant guidelines offers a handhold for limiting the enhancement to felonies or to certain types of misdemeanors.  Other courts of appeals have reached the same conclusion.  *See United States v. Damon*, 595 F.3d 395, 399–400 (1st Cir. 2010) (holding that the definition of "felony conviction" in U.S.S.G. § 2K2.1 does not incorporate 18 U.S.C. § 921(a)(20)(B)); *United States v. Shelton*, 91 F. App'x 247, 249 (3d Cir. 2004) (same); *United States v. Morris*, 139 F.3d 582, 583–84 (8th Cir. 1998) (same).  In the final analysis, the use of pepper spray, a device chosen for self-defense precisely because it injures and incapacitates attackers, "presents a serious potential risk of physical injury to another" when used offensively.  U.S.S.G. § 4B1.2(a)(2).

### III.

Mosley's remaining challenges to the results of this re-sentencing hearing also come up short.  He says that the district court should not have enhanced the guidelines range based on two juvenile adjudications, *see* U.S.S.G. § 4A1.2(a), claiming that these earlier adjudications would have been treated as one sentence "but for" an intervening

arrest. Yet this "but for" occurrence—an intervening arrest—is one of the dividing lines between offenses counted separately and those counted as a group. "Prior sentences are always counted separately if the sentences were imposed for offenses that were separated by an intervening arrest." U.S.S.G. § 4A1.2(a)(2). An "arrest" exists for this purpose even if the defendant "was taken into custody as a minor." *United States v. Curb*, 625 F.3d 968, 972 (6th Cir. 2010). Once the court determines that an intervening arrest separates two offenses, the "analysis ends [t]here." *Id.* at 971.

Mosley argues that his 96-month sentence is substantively unreasonable. Because the sentence falls within the guidelines range, a presumption of reasonableness applies, *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc), and Mosley has not overcome it. Factoring in the nature and circumstances of Mosley's conduct, the court found that he had committed an "extremely, extremely dangerous offense," carrying a "sawed-off [20-]gauge shotgun . . . stuck in [his] pants . . . apparently [with] the safety off." R.23 at 22. The court found that Mosley had shown "no respect for the law," and it believed the 96-month sentence would provide "adequate deterrence." *Id.* It also determined that the sentence imposed would "protect the public from Mr. Mosley until he gets himself squared around." *Id.* This sentence was not unreasonably long. *See United States v. Poynter*, 495 F.3d 349, 351–52 (6th Cir. 2007).

Mosley adds that he wanted to speak at his re-sentencing hearing, something that the district court did not invite him to do but something that neither he nor his attorney asked to do. District court judges, as an initial matter, would be wise to make this invitation in *all* sentencing hearings—"regardless of the timing," regardless of whether the hearing arises from a general or specific remand and regardless of whether an allocution invitation is required. *United States v. Jeross*, 521 F.3d 562, 586 (6th Cir. 2008); *see* Fed. R. Crim. P. 32(i)(4)(A)(ii). The cost of the invitation is minimal, and the potential price of neglecting to make it—further appeals—is not inconsiderable.

The government argues that there is no right to allocution in the context of a re-sentencing hearing when the hearing arises from a limited remand. *See Jeross*, 521 F.3d at 585; *Pasquarille v. United States*, 130 F.3d 1220, 1223 (6th Cir. 1997); *United States*

*v. Coffey*, 871 F.2d 39, 40–41 (6th Cir. 1989).  We need not rely on that ground here, however.  Any such obligation does not suspend the rules of harmless error, *see* Fed. R. Crim. P. 52(a), and any conceivable error here was harmless.

At Mosley's initial sentencing hearing, the district court offered him an opportunity to speak, and he made a brief statement apologizing for his past and present conduct.  Neither Mosley nor his counsel requested allocution at re-sentencing, where all that the court and parties revisited was the crime-of-violence question, something that had nothing to do with his prior allocution statement.  In the context of an initial sentencing hearing, it makes sense to presume prejudice when a court fails to offer allocution to a defendant.  *See United States v. Haygood*, 549 F.3d 1049, 1054 (6th Cir. 2008).  But the same is not true in a re-sentencing hearing prompted by a successful appeal that has nothing to do with, and in no way implicates, the right to allocution.

Mosley, indeed, has no cognizable theory of prejudice.  He was not "affirmatively denied an opportunity to speak during the hearing." *Hill v. United States*, 368 U.S. 424, 472 (1962).  He was not provided an invitation.  In arguing that he would have accepted that invitation, however, all he claims he would have addressed were the "varied and complex" "legal issues" raised at re-sentencing, Mosley Reply Br. at 10–11, namely the legal issues surrounding the question whether his other prior convictions amounted to crimes of violence.  But by the end of this hearing, which is when the allocution invitation normally occurs, the judge had already made up his mind about these "legal issues."  Allocution is not designed to allow defendants to re-argue their lawyers' legal positions, and, because that is all Mosley wished to do here, he cannot show prejudice.

IV.

For these reasons, we affirm.