*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRODERICK DAVID SAVAGE, also known as
BRODERICK CHRISTOPHER SEAWRIGHT,

Defendant-Appellant.

FOR PUBLICATION
April 23, 2019
9:00 a.m.

No. 339417
Livingston Circuit Court
LC No. 16-023638-FC

Before: SWARTZLE, P.J., and MARKEY and RONAYNE KRAUSE, JJ.

SWARTZLE, P.J.

On the one hand, pepper spray causes extreme burning, blinding of the eyes, and paralysis of the larynx, just to name a few of its intended, debilitating effects. Each of these would qualify as an injury to a person, as that term is commonly understood. On the other hand, pepper spray's debilitating effects are almost always temporary, typically passing within 20 minutes to a few hours, with almost all effects wearing off after a day or so. Does the temporary nature of these debilitating effects mean that they are not "injuries," but rather just "irritant effects"? If injuries, then the trial court properly scored defendant's sentencing guidelines for offense variables 1 and 2; if irritant effects, then the trial court erred.

We conclude that our Legislature intended to include temporary injuries as well as permanent ones for purposes of offense variables 1 and 2, and therefore the trial court did not err. Finding no other basis to reverse, we affirm.

## I. BACKGROUND

A jury convicted defendant of armed robbery, MCL 750.529; unlawfully driving away a motor vehicle, MCL 750.413; felonious assault, MCL 750.82; carjacking, MCL 750.529a; and four counts of possession of a pneumatic gun during the commission of a felony (felony-firearm), MCL 750.227b(2). Defendant's convictions followed from an early morning robbery of a hotel in Hartland, Michigan. At the time, the only hotel employee working was a newly hired 19-year-old female clerk. The hotel door was locked, but a masked man knocked on the

door, seeking entry. Although she saw that the man was masked, the hotel clerk was afraid of what would happen to her if she ignored him, so she let him inside.

Once inside, the masked man demanded money from the hotel's cash drawers, the hotel clerk complied, and the man took the money. The masked man also demanded the hotel clerk's purse, she again complied, and the man took her wallet and car keys. The man had what appeared to be a black semiautomatic handgun, and the hotel clerk feared for her life. After taking the money, wallet, and keys, the man told the hotel clerk to get on the ground, and she did. The man then sprayed her in the face with pepper spray and fled. The hotel clerk watched as her car drove away from the hotel, but she admitted that she could not tell if the same person who robbed the hotel took the vehicle.

The police were called to the hotel. The hotel clerk initially told officers that the robber was "not Black" because she thought that his wrist, visible between the clothing and the gloves that he wore to conceal his identity, looked "tan" in color. She noted that the robber was a few inches taller than her (she is 5'3"). With regard to the chemical used on the hotel clerk, police officers confirmed that it was regular, over-the-counter oleoresin-capsicum-based pepper spray. The officer who arrived at the hotel testified that, based on his experience and training, the effects of the pepper spray could last "an hour, depending on if you reactivate it, it [sic] if you sweat, if you open up any glands, but typically, for vision and for respiratory, it's, I'd say, a minimum of 20 minutes." The officer confirmed that the victim did not suffer from any life-threatening injuries, but she was in considerable pain. The officer used water to flush the chemical off the victim's face. The victim testified that it took a while for the effects of the pepper spray to subside, she was in pain for about 24 hours, but she suffered no "lasting effects."

Approximately six hours after the hotel robbery, police arrested defendant in Flat Rock, Michigan, while in possession of the hotel clerk's car. Officers observed defendant wearing a mask, and the hotel clerk later identified it as the same mask worn by her assailant. Officers also saw defendant place something under the driver's seat, where they later found a pneumatic handgun painted to appear like an ordinary handgun. The hotel clerk's wallet and keys were in the car, as well as items of clothing and a backpack that matched those worn by the robber as shown in the hotel surveillance video. The police further found a container of pepper spray on defendant, along with $376 in cash. Although the police arrested defendant in Flat Rock, over an hour's drive from the location of the robbery in Hartland, cell-phone records indicated that defendant's cell phone was used near Hartland around the time of the robbery. The police did not conduct forensic testing, such as finger-print analysis or DNA testing. Defendant did not testify on his own behalf.

After the close of proofs, the prosecutor and defense counsel gave closing arguments. In his initial closing argument, the prosecutor discussed defendant's interactions with Flat Rock Police, including a video recording of the encounter that was presented at trial. The prosecutor noted that the video showed defendant providing answers to most of the officer's questions, including why defendant was wearing a mask. The prosecutor then pointed out that defendant remained silent when the officer asked defendant, "Whose car is that?" The prosecutor used this interaction to argue that defendant was not honest in his responses to the officer.

During his closing argument, defense counsel argued extensively that, apart from perhaps unlawfully driving away, defendant was innocent of all charges because another person could have stolen the hotel clerk's car and other belongings and given them to defendant. In rebuttal, the prosecutor argued that this defense theory was not believable, returned to defendant's interaction with the officer, and again played the video for the jury, highlighting defendant's lack of response to the police officer's question about where defendant obtained the car. The prosecutor then asked rhetorically:

> I want you to look at the evidence and instead of assuming what Mr. Savage might have said, or assuming what might have happened, go to what he didn't say, admitted he was asked the one question that could have answered all of this. Where did you get the car from?

After hearing the testimony and other evidence, the lawyers' arguments, and the trial court's instructions, the jury convicted defendant of armed robbery and the other charges noted earlier.

At sentencing, the trial court calculated defendant's advisory-guidelines range for the armed-robbery conviction, a class A offense. MCL 777.16y. With respect to the offense variables (OVs), the trial court scored OV 1 (aggravated use of a weapon) at 20 points and OV 2 (lethal potential of the weapon) at 15 points because the pepper spray used on the hotel clerk qualified as a "harmful chemical substance." The trial court assigned 10 points for OV 10 (exploitation of a vulnerable victim) and five points for OV 12 (contemporaneous felonious criminal act). Together with the other applicable variables, the trial court assigned defendant a total OV score of 100 points, placing defendant in OV Level VI (100+ points) on the applicable sentencing grid. MCL 777.62. The trial court assigned a prior record variable (PRV) score of 35 points, placing defendant in PRV Level D (25-49 points). *Id*.

These scores put defendant in the D-VI cell, resulting in a sentencing-guidelines range of 171 to 285 months of prison. MCL 777.62. Because defendant was sentenced as a third-offense habitual offender, the upper limit of defendant's guidelines range was increased by 50%, MCL 777.21(3)(b), resulting in an enhanced sentencing-guidelines range of 171 to 427 months of prison. The trial court sentenced defendant, as a third-offense habitual offender, MCL 769.11, to prison terms of 20 to 40 years each for the armed robbery and carjacking convictions, 5 to 10 years for the unlawfully driving away conviction, and four to eight years for the felonious assault conviction, to be served concurrently to each other, but consecutive to four concurrent prison terms of two years each for the felony-firearm convictions.

This appeal followed.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first challenges the sufficiency of the evidence to support his convictions. We review de novo a challenge to the sufficiency of the evidence. *People v Harverson*, 291 Mich App 171, 175-176; 804 NW2d 757 (2010). We review the evidence in the light most favorable to the prosecution and determine whether the jury could have found each element of the charged

crime proved beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of [a] crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). We are also "required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Defendant does not challenge any of the individual elements of the offenses of which he was convicted, but argues only that the evidence was insufficient to prove that he was the person who robbed the hotel and committed the other charged offenses. It is well settled that "identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). In challenging the evidence of his identity, defendant focuses on inconsistencies between his physical appearance and the description that the hotel clerk initially gave police of the robber's height and skin color. Defendant also argues that the money recovered from him when he was arrested could not be tied to the money taken from the hotel.

Defendant's arguments ignore substantial evidence that supported the jury's conclusion that he committed the charged offenses. Police found defendant in possession of the hotel clerk's car, while he was wearing the mask used by the armed robber, and while he was in possession of both pepper spray and the pneumatic handgun used in the robbery. Multiple other items of evidence tied to the robbery were found in defendant's possession, and cell-phone records placed defendant near the scene of the robbery around the time of the robbery. To the extent that there were conflicts between the hotel clerk's initial description of her assailant and defendant's actual appearance, it was up to the jury to consider those conflicts together with the remaining evidence relevant to the identity of the robber. We "must defer to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses" and must resolve conflicts in the evidence in favor of the prosecution. *Bennett*, 290 Mich App at 472. Viewing the record in the light most favorable to the prosecution, the jury could have concluded beyond a reasonable doubt that defendant was the person who robbed the hotel and committed the other charged offenses.

Additionally, although defendant complains that police conducted no forensic testing of the evidence found in the victim's car or at the hotel, "[a]bsent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process." *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003). Defendant does not argue that the police intentionally suppressed inculpatory evidence or acted in bad faith. His complaint that police conducted no forensic testing of the evidence was a matter for the jury to consider in its evaluation of the weight and strength of the evidence, but it does not render the evidence presented insufficient to support his convictions.

## B. PROSECUTOR'S CONDUCT

Defendant next argues that he was denied a fair trial because the prosecutor engaged in misconduct during closing argument. He argues that the prosecutor's remarks during rebuttal closing about what defendant "might have said" but "didn't say," namely, answering the officer's question, "Where did you get the car from?" amounted to an improper comment on defendant's failure to testify. Because defendant did not object to the prosecutor's remarks at

trial, we review this unpreserved claim for plain error affecting substantial rights. *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004).

Initially, we note that under this Court's jurisprudence, this is not a claim of "prosecutorial misconduct" (i.e., extreme or illegal conduct), but rather one of "prosecutorial error." See *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). The test for prosecutorial error is whether the prosecutor committed error that "deprived defendant of a fair and impartial trial." *Id*. at 88. "A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010).

Viewed in context, the prosecutor's comments were not an improper reference to defendant's decision not to testify at trial, nor were they an improper reference to defendant declining to answer a police officer's question. See *People v Hackett*, 460 Mich 202, 213-215; 596 NW2d 107 (1999). During his closing, defense counsel argued that his client was innocent of all charges because another person could have stolen the victim's car and other belongings and given them to defendant. To rebut this, the prosecutor replayed the officer's video for the jury, highlighting the fact that defendant actually answered almost all of the officer's questions except for the question about who owned the car, and urging the jury to disregard the unsupported hypotheticals defense counsel had posed. Thus, the prosecutor's argument was directly responsive to defense counsel's argument; and it was a commentary on the pattern of defendant's responses to the police officer, which the jury could observe for itself, rather than on any invocation of defendant's Fifth Amendment right to remain silent or decision not to testify at trial. Accordingly, we reject defendant's claim of error.

We also reject defendant's related claim that defense counsel was ineffective for failing to object to the prosecutor's remarks. Because the remarks were not improper, defense counsel was not ineffective for failing to object to those remarks. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## C. SENTENCING

Defendant next argues that he is entitled to resentencing because of errors in the trial court's scoring of the sentencing guidelines. Defendant challenges the trial court's assessment of points for OVs 1, 2, 10, and 12.

### 1. STANDARDS FOR REVIEWING SENTENCING

At sentencing, trial courts must consult and consider the applicable sentencing-guidelines range, but the range is advisory only. *People v Steanhouse*, 500 Mich 453, 470; 902 NW2d 327 (2017). When reviewing the trial court's scoring of the sentencing guidelines, we consider whether the trial court's factual findings were clearly erroneous, and we review de novo its legal conclusions. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). A trial court may consider all record evidence when calculating the sentencing-guidelines range. *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012).

Our Legislature enacted the guidelines in statute, and therefore when we construe a particular guideline, we apply the familiar rules of statutory construction. We must "give effect to the Legislature's intent," and we presume that the Legislature intended "the meaning clearly expressed." *D'Agostini Land Co, LLC v Dep't of Treasury*, 322 Mich App 545, 554; 912 NW2d 593 (2018) (citations omitted). When a particular term is not defined in statute, we may look "to authoritative dictionaries for further guidance." *In re Guardianship of Redd*, 321 Mich App 398, 407; 909 NW2d 289 (2017); see also *Woodard v Custer*, 476 Mich 545, 561; 719 NW2d 842 (2006) (referring to a specialized medical dictionary). "A statutory provision is ambiguous only if it irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning. Only when ambiguity exists does the Court turn to common canons of construction for aid in construing a statute's meaning." *D'Agostini Land*, 322 Mich App at 554-555 (cleaned up). Finally, we avoid construing a statute in such a way that part of the statute becomes "surplusage or nugatory." *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 528; 817 NW2d 548 (2012).

### 2. PEPPER SPRAY—A CHEMICAL IRRITANT OR A HARMFUL CHEMICAL SUBSTANCE?

Defendant challenges the trial court's assessment of 20 points for OV 1 based on his use of pepper spray against the hotel clerk. Defendant argues that pepper spray should be categorized as merely a "chemical irritant," rather than the more dangerous "harmful chemical substance," and therefore he should have been assessed only five points on OV 1. He also argues that the trial court erred in assessing any points under OV 2 for similar reasons. Defense counsel challenged this scoring at sentencing, and therefore the claims are preserved for appeal.

OV 1 addresses the "aggravated use of a weapon." MCL 777.31. The statute provides in relevant part:

(1) Offense variable 1 is aggravated use of a weapon. Score offense variable 1 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

* * *

(b) The victim was subjected or exposed to a harmful biological substance, harmful biological device, harmful chemical substance, harmful chemical device, harmful radioactive material, harmful radioactive device, incendiary device, or explosive device............................... 20 points

* * *

(2) All of the following apply to scoring offense variable 1:

* * *

(d) Score 5 points if an offender used a chemical irritant, chemical irritant device, smoke device, or imitation harmful substance or device. [MCL 777.31.]

Thus, a trial court should assess 20 points for OV 1 when the victim was subjected or exposed to a "harmful chemical substance" or "harmful chemical device," MCL 777.31(1)(b), but it should assess only five points when the defendant instead used a "chemical irritant" or "chemical irritant device," MCL 777.31(2)(d). For the meaning of these terms, OV 1 incorporates by reference definitions from MCL 750.200h. MCL 777.31(3)(a).

Turning to MCL 750.200h, a "harmful chemical substance" is defined as "a solid, liquid, or gas that through its chemical or physical properties, alone or in combination with 1 or more other chemical substances, can be used to cause death, injury, or disease in humans, animals, or plants." MCL 750.200h(i). For its part, a "chemical irritant" is defined as a "solid, liquid, or gas that through its chemical or physical properties, alone or in combination with 1 or more other substances, can be used to produce an irritant effect in humans, animals, or plants." MCL 750.200h(a). A "harmful chemical device" and a "chemical irritant device" are simply devices designed or intended to release the respective chemical substance or irritant. MCL 750.200h(b),(h). An "irritant effect" is not further defined in statute, so we turn to an authoritative medical dictionary, where "irritant" is defined primarily as "a substance that causes inflammation and other evidence of irritation, particularly of the skin, on first contact or exposure, or as a reaction to cumulative contacts, not dependent on a mechanism of sensitization." "Irritation" is further defined, "The evocation of a normal or exaggerated reaction in the tissues by the application of a stimulus." *Stedmans Medical Dictionary* (28th ed). Finally, an "injury" is commonly understood to mean "hurt, damage or loss sustained." *Merriam Webster's Collegiate Dictionary* (11th ed).

Comparing these definitions, the key distinction between a "harmful chemical substance" and a "chemical irritant" is whether the chemical substance can be used to cause "death, injury, or disease" in a person or, rather, can be used only to produce "an irritant effect" in that person. There is no binding precedent directly on-point. In fact, very few published opinions of this Court have addressed what qualifies as a "harmful chemical substance" for purposes of scoring OV 1 and 2, and none have addressed what qualifies as a "chemical irritant" for purposes of scoring OV 1.

In *People v Blunt*, 282 Mich App 81; 761 NW2d 427 (2009), this Court considered whether heated cooking oil, used as a weapon to commit an assault, qualified as a "harmful chemical substance" under OV 1. Reasoning that the statutory definition in MCL 750.200h referred to substances that "possess an inherent or intrinsic ability or capacity to cause death, illness, injury, or disease," *id*. at 86, the *Blunt* Court held that, even though cooking oil is a chemical substance, it cannot cause death, injury, or disease through its chemical or physical properties, *id*. at 87, and therefore does not qualify as a "harmful chemical substance," *id*. at 89. The *Blunt* Court held that the trial court erred in assessing 20 points for OV 1 and remanded for resentencing with an assessment of zero points for that OV. *Id*. Although instructive in understanding the meaning of the term "harmful chemical substance," this Court's decision in *Blunt* does not resolve the question presented here because that decision did not consider the meaning of the term "chemical irritant."

In *People v Ball*, 297 Mich App 121, 124; 823 NW2d 150 (2012), this Court held that heroin qualifies as a "harmful chemical substance" under OV 1, because heroin "is capable of causing death." The *Ball* Court clarified, however, that a "harmful chemical substance" must be

used as a weapon to justify the assessment of points under OV 1. *Id*. at 125. Because the heroin in that case was not used as a weapon, the *Ball* Court held that the trial court erred in assessing 20 points for OV 1 and remanded for resentencing with an assessment of zero points for that OV. *Id*. at 126. Similar to the decision in *Blunt*, the decision in *Ball* does not resolve the issue here because there is no question that defendant used the pepper spray as a weapon.

In *People v Norris*, 236 Mich App 411; 600 NW2d 658 (1999), this Court concluded that pepper spray, mixed with military tear gas, qualified as a "dangerous weapon" within the meaning of the armed-robbery statute. *Norris* is distinguishable from this case, however, for several reasons. First, the substances are different—in *Norris*, a military-grade mixture of pepper spray and tear gas, where here, ordinary, over-the-counter pepper spray. Second, *Norris* addressed whether the prosecutor in that case presented sufficient evidence of all the elements of armed robbery, MCL 750.529, specifically, whether the chemical mixture qualified as a "dangerous weapon" within the meaning of that statute. The *Norris* Court noted that the nature of an object and the manner in which it is used determine whether it qualifies as a "dangerous weapon," and the Court noted that a "dangerous weapon" has been described as either (1) a weapon designed to be dangerous and capable of causing death or serious injury or (2) any other object capable of causing death or serious injury that the defendant used as a weapon. *Id*. at 414-415. Because the *Norris* Court considered the military mixture in the context of a sufficiency challenge, the Court reviewed the evidence in the light most favorable to the prosecution. *Id*. at 414. As noted earlier, we review the trial court's factual findings for clear error but its legal conclusions de novo.

In the absence of binding precedent, we next consider the nature and effects of pepper spray in light of the statutory language of OV 1. The active ingredient of pepper spray is oleoresin capsicum. The spray may also contain other chemicals, depending on whether it is delivered as a mist spray, aerosol spray, or some other form. Oleoresin capsicum is derived from common pepper plants, although that somewhat understates its potency. As explained by the U.S. Court of Appeals for the Sixth Circuit in *United States v Mosley*, 635 F3d 859, 862 (CA 6, 2011), a pepper's "hotness" is measured in "Scoville" units. A jalapeno pepper typically measures about 5,000 Scoville units, a habanero pepper about 200,000 Scoville units, and one of the world's most potent peppers, the "Naga Viper," has reached 1,382,118 Scoville units. In comparison, the oleoresin capsicum in ordinary pepper spray is distilled and concentrated to provide a relatively heavy dose that "routinely reaches 2 million Scoville units, and at least one commercially available brand boasts a 5.3 million Scoville unit resin." *Id.* (citations omitted).

The effects of pepper spray are well established. It can cause irritation and inflammation when applied to the eyes, nose, throat, and skin. This can result in an extreme burning sensation that causes mucus to come from the nose, involuntary closing and blinding of the eyes, paralysis of the larynx and gagging or gasping for air, and the inability to speak. Inhalation of pepper spray has also been reported to exacerbate the effects of asthma on those who suffer from that condition. See, e.g., *id*.; *When Does Use of Pepper Spray, Mace, or Other Similar Chemical Irritants Constitute a Violation of Constitutional Rights*, 65 ALR6th 93 (2011). These are not the side effects, but rather the intended effects of pepper spray. As the *Mosley* court explained, pepper spray "is *designed* to cause intense pain." *Mosley*, 635 F3d at 862 (cleaned up). Moreover, these effects are intrinsic to the application of concentrated oleoresin capsicum, see *id.*, distinguishing this case from the heated cooking oil in *Blunt*, 282 Mich App at 86-89.

-8-

Pepper spray is, without doubt, a chemical irritant. See *Use of Pepper Spray*, 65 ALR6th 93. Acknowledging this does not, however, end the inquiry. The various categories set out in OV 1 are not mutually exclusive. This is most readily reflected in the Legislature's requirement that the trial court determine which of the various conditions apply and assign "the number of points attributable to the one that has the *highest* number of points." MCL 777.31(1) (emphasis added). A chemical substance can be, in short, both an irritant and a harmful substance.

We have no hesitation in concluding that the effects of pepper spray, as described by the hotel clerk and officers in this case and recounted in case law, qualify as an "injury . . . in humans" for purposes of OV 1 and MCL 750.200h. Blinding of the eyes, paralysis of the larynx, and extreme pain clearly rise above mere irritant effects and qualify as injuries (i.e., "hurt, damage"), potentially even serious and debilitating injuries. Again, this is what pepper spray is designed to do—incapacitate a person with intense pain and involuntary physiological reactions.

With that said, in nearly all uses of pepper spray, the injuries are temporary, lasting anywhere from 20 minutes to a few hours to a day. The question becomes, then, whether the intended temporary nature of these injuries somehow removes pepper spray from the category of harmful chemical substance, thereby making it merely a chemical irritant? In other words, because pepper spray is designed to inflict temporary injury but not permanent injury, does this mean that the Legislature intended to exclude the spray from the category of harmful chemical substances? For several reasons, the answer is *No*.

First and foremost, there is nothing in the plain language of OV 1 to suggest that the Legislature intended that only a permanent injury qualify for the higher point score. Of the three afflictions listed in the definition of harmful chemical substance, only one—death—is inherently permanent. The other two—injury and disease—can be permanent, but also can be temporary. The very fact that common experience confirms that persons routinely recover from many injuries and diseases in short order (e.g., a sprained ankle, a common cold) suggests that had the Legislature intended to limit harmful chemical substances to only those that cause permanent injury or disease, it would have explicitly said so.

Second, the Legislature has elsewhere recognized that the harm from pepper spray can result in an injury to a person. In the Firearms chapter of the Penal Code, the Legislature has provided that pepper spray can lawfully be used as a self-defense device under certain circumstances. MCL 750.224d(5)(b). The Legislature specifically excluded from the definition of a self-defense device those devices that use "a gas or substance that will *temporarily* or permanently disable, incapacitate, *injure*, or harm a person . . . *other than the substance described*" in the statute, i.e., pepper spray. MCL 750.224d(1)(b) (emphasis added). By (i) recognizing that there are numerous devices that emit a gas or substance that can temporarily or permanently injure a person and (ii) prohibiting the use of those, but then (iii) carving out an exception for those devices that emit pepper spray, there is a strong inference that the Legislature recognized that pepper spray can, in fact, injure a person, even if just temporarily.

Third, our conclusion that pepper spray can injure a person is consistent with several decisions outside of this jurisdiction. For example, the federal appellate court in *Mosely* observed that pepper spray can "cause physical injury," "extreme pain," and "prolonged impairment of bodily organs." *Mosely*, 635 F3d at 861-862 (cleaned up). The court noted that

misuse of pepper spray can even "constitute excessive force in violation of the Fourth and Fourteenth Amendments." *Id.* at 862-863 (collecting cases). The court held, "In the final analysis, the use of pepper spray, a device chosen for self-defense precisely because it injures and incapacitates attackers, presents a serious potential risk of physical injury to another when used offensively." *Id.* at 864 (cleaned up); see also *Weaver v State*, 325 Ga App 51, 53; 752 SE2d 128 (2013) (affirming conviction for aggravated assault ("likely to . . . result in serious bodily injury") based on the use of pepper spray); *State v Harris*, 966 So2d 773 (La App, 2007) (concluding that pepper spray caused "serious bodily injury," even though the injuries were not permanent).

Defendant counters that it is illogical to believe that the Legislature intended to assign a higher score for an offender who used pepper spray against a victim than one who used a short-barreled shotgun or pistol. See MCL 777.32(1)(c),(d) (scoring for OV 2). "This is an argument from policy implication, rather than an argument from law." *D'Agostini Land*, 322 Mich App at 560. We could speculate on why the Legislature might want to punish the use of certain chemical weapons more harshly than traditional ones, but we will not do so. As this Court has observed, "It is not our place to divine *why* the Legislature" made particular policy choices when enacting a statutory scheme, it is our place only to determine what choices the Legislature actually made. *Id.*; see also *Johnson v Recca*, 429 Mich 169, 187, 196-197; 821 NW2d 520 (2012).

Finally, it has also been argued that, for purposes of the aggravated use of a weapon under OV 1, the Legislature created a lesser classification for chemical irritants that are not potent enough to be a harmful chemical substance. If pepper spray does not satisfy this lesser category, then what does? This is a variant of the canon of statutory construction that courts should not construe a statute in a way that makes a provision nugatory. See *People v McGraw*, 484 Mich 120, 126; 771 NW2d 655 (2009).

While not without some rhetorical force, we ultimately reject this argument as well. The language of OV 1 is not ambiguous, and therefore we need not turn to canons of construction for assistance in construing its meaning. *D'Agostini Land*, 322 Mich App at 558. Even assuming for the sake of argument that the language was ambiguous, there is no logical inconsistency in our reading that would necessarily make the "chemical irritant" category nugatory. There may be instances where a milder chemical substance is used by a defendant as a weapon, but rather than causing debilitating pain and injury, it causes only a minor irritation on the victim's skin. Simply put, a lack of imagination is not a valid canon of construction. Our reading does not foreclose another chemical substance from landing solely in that lesser category and, therefore, we have not read that category out of the statutory scheme.

Pepper spray is a harmful chemical substance, and the trial court did not err in scoring 20 points under OV 1 for defendant's use of the spray against the hotel clerk. Similarly, because OV 2 (lethal potential of the weapon possessed or used) uses the same term ("harmful chemical substance") and relevant definitions as OV 1, the trial court did not err in scoring 15 points under OV 2. MCL 777.32(1)(a).

## 3. DEFENDANT'S EXPLOITATION OF A VULNERABLE VICTIM

Defendant also challenges the trial court's assessment of 10 points for OV 10. MCL 777.40 provides the following instructions for scoring OV 10:

(1) Offense variable 10 is exploitation of a vulnerable victim. Score offense variable 10 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) Predatory conduct was involved ............................................. 15 points

(b) The offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status ........................................................................................ 10 points

(c) The offender exploited a victim by his or her difference in size or strength, or both, or exploited a victim who was intoxicated, under the influence of drugs, asleep, or unconscious ................................................................. 5 points

(d) The offender did not exploit a victim's vulnerability ................ 0 points

(2) The mere existence of 1 or more factors described in subsection (1) does not automatically equate with victim vulnerability.

(3) As used in this section:

(a) "Predatory conduct" means preoffense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization.

(b) "Exploit" means to manipulate a victim for selfish or unethical purposes.

(c) "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation.

(d) "Abuse of authority status" means a victim was exploited out of fear or deference to an authority figure, including, but not limited to, a parent, physician, or teacher.

Defendant argues on appeal that the trial court should have assessed zero points for OV 10 because he did not exploit one of the vulnerabilities listed in MCL 777.40(1)(b). Conversely, the prosecutor notes that the trial court could have assessed 15 points, rather than 10 points, because defendant engaged in predatory conduct. A review of the trial court record indicates that the trial court seemed to agree that the assessment of 15 points was appropriate, but, nonetheless, the trial court assessed only 10 points for OV 10.

Because the central subject of OV 10 "is the assessment of points for the exploitation of vulnerable victims," a trial court should assess points for OV 10 "only when it is readily apparent that a victim was 'vulnerable,' i.e., was susceptible to injury, physical restraint, persuasion, or temptation." *People v Cannon*, 481 Mich 152, 157-158; 749 NW2d 257 (2008). When determining whether "predatory conduct" is at issue, "vulnerability" does not have to be an inherent personal characteristic of the ultimate victim; instead, vulnerability may arise from external circumstances. *People v Huston*, 489 Mich 451, 463; 802 NW2d 261 (2011). For example, by "lying in wait" for a victim, a defendant makes the victim more susceptible to injury or physical restraint and, therefore, more "vulnerable." *Id*. at 466.

Predatory conduct does not encompass all types of preoffense conduct, but "only those forms of 'preoffense conduct' that are commonly understood as being 'predatory' in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or 'preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection.' " *Id*. at 462. Conduct can be considered predatory even if a defendant is not targeting a specific victim. A defendant places himself in a better position to rob someone by "predatorily lying in wait, armed, and hidden from view" and, therefore, directs his behavior at "a victim." *Id*. at 463.

At sentencing, the trial court appeared to agree that the assessment of 15 points was appropriate, yet left the score at 10 points, stating, "I think it probably should be 15 but I'm leaving it at ten because of the . . . stalking kind of thing, the predatory conduct, but we'll leave it at that." The evidence that defendant robbed the hotel early in the morning and approached the hotel clerk at a time when she was working alone is akin to lying in wait, supporting a conclusion that defendant engaged in predatory conduct. Thus, based on this record, the trial court could have scored OV 10 higher, and defendant very likely received a windfall by receiving only 10 points. Because the prosecutor has taken the position on appeal that the trial court correctly scored the guidelines, any error inured to the benefit of defendant, and increasing the score by five points would not change the applicable guidelines range, we decline to remand the matter for recalculation on this offense variable. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

### 4. CONTEMPORANEOUS FELONIOUS ACT

Defendant next challenges the trial court's assessment of five points for OV 12. MCL 777.42(1)(d) provides that the trial court should assess five points if "[o]ne contemporaneous felonious criminal act involving a crime against a person was committed." For an act to qualify as a contemporaneous felonious criminal act, it must have "occurred within 24 hours of the sentencing offense" and "has not and will not result in a separate conviction." MCL 777.42(2)(a).

At sentencing, the prosecutor argued that the trial court should assess five points because of defendant's assault of the hotel clerk with pepper spray, reasoning that the charged offenses all related to defendant's use of the pneumatic gun. Defendant countered that, although pepper spray qualified as a "dangerous weapon" for purposes of the felonious-assault statute, a broken pneumatic gun did not qualify as a "dangerous weapon." Defendant maintained that, "since pointing the broken airsoft gun could not constitute a felonious assault the jury must have . . .

-12-

convicted . . . because of the pepper spray." In the alternative, defendant argued that, if the jury convicted defendant because he used the pneumatic gun to commit the felonious assault, that felonious act already formed the basis of one of his convictions, precluding the trial court from assessing points for a contemporaneous felonious criminal act. The trial court agreed with the prosecutor, finding that all of defendant's convictions were premised on defendant's use of the pneumatic gun. Therefore, the trial court concluded that defendant's contemporaneous criminal act of spraying the victim with pepper spray qualified as an uncharged criminal act that would not result in a separate conviction. Accordingly, the trial court assessed 5 points for OV 12.

On appeal, defendant argues that the trial court improperly scored OV 12 because the use of pepper spray formed the basis for the carjacking conviction and the offense variable does not apply to uncharged cognate offenses stemming from the same physical acts that formed the basis of a defendant's conviction. In support, defendant cites *People v Light*, 290 Mich App 717, 726; 803 NW2d 720 (2010), in which this Court held that OV 12 could not be scored for uncharged larceny offenses where the defendant's robbery conviction "completely subsumed the larceny." This case is factually distinguishable from *Light*. Unlike the defendant in *Light*, who committed one act that comprised both the robbery of the victim and the underlying larceny, defendant in this case sprayed the victim in the face with pepper spray after he used the pneumatic gun to place her in fear and after she gave him her car keys.

The trial court did not clearly err in finding that the force or threat of force used to commit both the armed robbery and the carjacking was defendant's use of the pneumatic gun. See *Hardy*, 494 Mich at 438. Indeed, if the jury had not found that defendant used the pneumatic gun to commit the armed robbery, unlawfully driving away, felonious assault, and carjacking offenses, defendant could not have been convicted of four counts of felony-firearm. Accordingly, we reject defendant's claim on appeal that OV 12 was improperly scored.

5. JUDICIAL FACT-FINDING

Although not particularly clear, it appears that defendant also argues that the trial court engaged in impermissible judicial fact-finding at sentencing. This claim is wholly without merit, as the trial court sentenced defendant under the now-advisory sentencing guidelines, and judicial fact-finding is permissible. *People v Biddles*, 316 Mich App 148, 158-161; 896 NW2d 461 (2016).

D. DEFENDANT'S STANDARD 4 BRIEF

Finally, defendant filed a supplemental brief under Supreme Court Administrative Order No. 2004-6, Standard 4. Defendant appears to argue that the case should be remanded for an evidentiary hearing or other relief due to the suppression of favorable evidence. Although defendant cites *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), to support his remand request, he does not raise a concurrent claim of ineffective assistance of counsel.

Defendant appears to argue that defense counsel should have been permitted to review a witness's 911 phone call to the Flat Rock Police Department and videos from the dash cameras of Flat Rock police officers and Michigan State Police troopers. A criminal defendant has a due-process right of access to certain information possessed by the prosecution. *Brady v Maryland*,

373 US 83, 87-88; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Yet, defendant provides no basis for concluding that defense counsel did not, in fact, possess this evidence. Further, defendant does not assert that these items of evidence would have been exculpatory. Defendant merely asserts that these recordings may or may not have supported the testimony of the hotel clerk and the arresting officer. Defendant also fails to discuss how any failure to provide this evidence was prejudicial in light of the other evidence presented at trial. It is not the role of this Court to make arguments and find authority to support defendant's assertions. *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001). Accordingly, defendant is not entitled to relief with respect to his *Brady* arguments.

## III. CONCLUSION

Pepper spray is designed to injure a person—temporarily. For purposes of sentencing, our Legislature distinguishes between chemical substances that cause an "injury" versus those that cause merely an "irritant effect." As explained, we conclude that a temporary injury is still an injury, and therefore the trial court did not err in holding that pepper spray was a harmful chemical substance for purposes of OVs 1 and 2. Defendant's remaining claims of error are without merit.

Affirmed.

/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ Amy Ronayne Krause